[Crim. No. 3355. In Bank.—October 1, 1930.]

In the Matter of the Application of R. P. SHULER for a Writ of Habeas Corpus.

Thomas S. Bunn and Schweitzer & Hutton for Petitioner.

Everett W. Mattoon, County Counsel, S. V. O. Prichard, Deputy County Counsel, Alexander Macdonald and Allen W. Ashburn for Respondent.

RICHARDS, J.—The applicant herein applied for a writ of *habeas corpus* and was granted a hearing thereon upon his averment that he was imprisoned, detained, confined and restrained of his liberty by William I. Traeger, sheriff of Los Angeles County at Los Angeles in said county, and that said imprisonment, detention, confinement and restraint were and are illegal, the alleged illegality of which arises out of the existence of certain facts which are set forth in his aforesaid petition, and which may be stated as follows: On or about the twenty-eighth day of April, 1930, one L. Vaillancourt made and filed in the Superior Court of the State of California, in and for the County of Los Angeles, an accusation in the form of several affidavits, verified by said Vaillancourt, charging the applicant herein with having made a series of addresses to the public over and by means of a certain radio station, which addresses are set forth *in haec verba* and *seriatim* in said affidavits, and upon the statements and substance contained therein it is alleged by the affiant they were intended and were calculated and were spoken and broadcasted by the petitioner for the purpose and with the intent that they should and would interfere with, influence, sway and control the proceedings in a certain action numbered Criminal No. 35227 then pending in said court and in the department thereof presided

over and conducted by Superior Judge Marshall F. Mc-Comb, and interfere with, sway, control, embarrass and influence the action and decision of said Judge McComb, acting as said judge of the superior court in said cause, and of any other judge who might be called upon to take any action or make any ruling or decision therein, and also to interfere with, influence, sway and intimidate any person or persons who might be called upon to act as jurors in said action, and also to bring into disrepute the said Judge McComb and the court over which he was at said time and in the conduct of said cause presiding, and expose him and it with respect to said action then pending to public disfavor, distrust, suspicion, ridicule and opprobrium, and impute to said Judge McComb dishonest, corrupt and unlawful motives, purposes and actions in connection with his rulings and decisions of said action, and by so doing interfere with the orderly and due administration of justice in said court in respect to said action. Coincidently with the filing of the aforesaid accusation and affidavits of said Vaillancourt there were also filed and presented to said court certain further affidavits made and sworn to by one Walter S. Cox, setting forth certain further facts with respect to certain other utterances of the petitioner herein, also publicly broadcast over and by means of said radio broadcasting station, and having reference to certain other actions and proceedings pending in said court and before said Judge McComb and other certain judges of said court and also having reference to pending proceedings of a grand jury then in session and functioning as a part of said court, and which statements and utterances of the petitioner, as set forth in detail therein, were also alleged to have had a like tendency and purpose to interfere with the orderly proceeding of said court and of said grand jury and the due administration of justice in said county.

Upon the filing and presentation of the foregoing accusation and affidavits before said superior court that tribunal on the twenty-ninth day of April, 1930, issued its order and direction to R. P. Shuler, the petitioner herein, requiring him to show cause on May 8, 1930, in department 45 of said superior court, why he should not be adjudged guilty of contempt of said court. Said affidavits and order were duly served upon said Shuler upon said last-named date,

and thereafter and prior to the aforesaid date of hearing thereon the said R. P. Shuler appeared and filed in said court his verified answer to the aforesaid accusation and the affidavits filed in support thereof. A hearing upon said accusation and the answer thereto was thereupon, upon the request of said Shuler, advanced and set for hearing for May 2, 1930, at which time the matter was heard and evidence for and against the accusation and the answer thereto was duly received and said matter was thereupon submitted for decision to the court in department 45 thereof, Clair S. Tappaan, judge of said court then and there presiding in and over the aforesaid department thereof. Thereafter and on the fifth day of May, 1930, the judgment and commitment of said court and of the aforesaid judge thereof was given, made and entered, adjudging that the petitioner herein by his aforesaid utterances, publishings and broadcastings of the matters set forth in said affidavits and each of them, had committed a contempt of said court and was thereby adjudged and declared to be in contempt of said court on account thereof, and should be punished therefor by such imprisonment and fines as were set forth and provided for in the aforesaid judgment and commitment, and that the terms of imprisonment set forth therein and designated as his punishment for the several and separate acts of contempt as designated by the terms of said judgment should run consecutively. Thereupon and upon the entry of the aforesaid judgment and commitment the petitioner was committed to the custody of the sheriff of Los Angeles County for the execution thereof. Thereafter and pursuant thereto the petitioner was, as shown by his petition herein, imprisoned for the period of ten days immediately after the entry of said judgment and in pursuance thereof, thereafter the petitioner having in the meantime offered to pay the portions of the several fines as specified in said judgment remaining due after such term of imprisonment, applied to this court for release upon *habeas corpus* upon the grounds hereinabove set forth. A writ of *habeas corpus* was thereupon issued out of this court and the petitioner was released upon bail pending the hearing thereon. Such hearing has been held and the matters therein considered have been duly submitted to this court for decision. In order to such decision a more detailed statement of the facts and

circumstances, as the same were presented to the superior court upon the aforesaid accusation and affidavits and the answer of the petitioner thereto, will be required. The facts about to be thus set forth, with sufficient of detail to form the basis of a correct conclusion thereon, are as follows:

On or about February 23, 1930, there was pending and undetermined in the Superior Court of the State of California, in and for the County of Los Angeles, a criminal action numbered "Criminal No. 35227," in which the people of the state of California were plaintiffs and one Ben Getzoff and one Jacob Berman, *alias* Jack Bennett, were defendants, and in which action said defendants were accused by indictment of the crime of bribery. The acts of bribery in which said defendants were implicated directly involved one Asa Keyes and one Harold L. Davis, the former having been at the time of the occurrence of said acts of bribery district attorney of the county of Los Angeles, and the latter having been chief deputy district attorney under said Keyes. The accusation presented against said two officials arose out of and was directly connected with two other certain criminal actions in said superior court and in which a number of persons, including one S. C. Lewis, E. H. Rosenberg and Jacob Berman, *alias* Jack Bennett, were accused of the crime of conspiracy to obtain money by false pretenses through an alleged violation of the Corporate Securities Act (Stats. 1917, p. 673), otherwise known as the Blue Sky Law. Upon the trial of said two officials upon said charge said Jacob Berman and said Ben Getzoff had been induced to appear and testify as to the part which they and each of them had taken in bribing said officials, with a view to procuring a dismissal of the charges against said S. C. Lewis and the others of said alleged conspirators, and it was doubtless by reason of their statements in the way of confessions as thus given and testified to that the said officials were convicted of their aforesaid crime. The immediate result of the accusation against these two officials was that of the appointment of Buron Fitts to succeed Asa Keyes as district attorney, with the consequent prosecution of said officials by said Buron Fitts. Following the conviction of said officials there remained upon the calendar of said court the cases of the several defendants who in the original actions had been accused of the crime of conspiracy to violate

the Corporate Securities Act, and who, or some of whom, had been implicated in the aforesaid confessions of Berman and Getzoff in the alleged acts of receiving bribes of which said officials had been found guilty. During the considerable period of time following the exposure of the existence of the aforesaid conspiracy to violate the Corporate Securities Act, and in which the interests and fortunes of a very large number of people had become involved, there had come into existence a very acute and quite exasperated state of public opinion against the defendants who had been charged with said crime, and also against the officials who had been accused and convicted of corruption in office in respect to the prosecution of those who were charged with said conspiracy. The petitioner herein, who was, during said period and for some time prior thereto, the pastor of a certain church and congregation in the city of Los Angeles, became deeply and actively interested in the awakening, arousing and in forming a state of public opinion with relation to the offenses with which the aforesaid persons had been charged and with respect to the proper prosecution of said offenses. The petitioner was accustomed during said period to make use of the radio, through one of its largest broadcasting stations in that region, in order to give widespread publicity to his opinions and utterances upon whatever subjects he sought by such means to discuss, particularly upon the subject of the public scandal which had arisen by reason of the alleged criminal acts of the defendants in said original actions and of said officials in connection with the prosecution of the same; and it may not be denied that the petitioner herein had acquired and occupied a very large sphere of influence in the way of arousing, directing and leading public opinion with respect to said conspiracy and with respect to said officials who had been charged and who have been convicted of accepting bribes with a view to defeating public justice in the pursuit and conviction of the persons charged with said conspiracy. It was while local public opinion was being thus aroused to a state of great tension that the proceedings took place out of which grew the accusation which was made against the petitioner herein, to the effect that he had committed one or several contempts of court with relation to certain actions which were still pending in said superior court, and which alleged acts of con-

tempt had consisted in those certain public utterances which the petitioner had been making and broadcasting in the manner above set forth with relation to certain of the proceedings which had taken place and which were yet to take place in said court before and on the part of several judges thereof to whom had been committed in their respective departments the conduct of such pending causes, and whose acts and conduct in relation thereto formed the chief subject of the petitioner's aforesaid publicly broadcasted utterances.

The particular facts which formed the background for the petitioner's broadcasted statements made from the pulpit of his church on or about the twenty-third day of February, 1930, and which are correctly set forth in the first affidavit of Vaillancourt are the following: On and prior to February 21, 1930, Marshall F. McComb was one of the judges of the Superior Court in and for the County of Los Angeles, and was acting and presiding as such in department No. 45 of said court. Criminal action No. 35227, in which Ben Getzoff and Jacob Berman, *alias* Jack Bennett, were defendants, and as such were under indictment for the aforesaid crime of bribery, was called for trial; whereupon Buron Fitts, as district attorney of said county, rose to request a further continuance of the trial of these two defendants, and in so doing stated in substance that he was holding these two defendants with the expectation of using them and each of them as witnesses against certain of those persons who were under indictment upon the charge of conspiracy to violate the Corporate Securities Act, and that a present insistence upon the prosecution of these two defendants might have the effect of so far closing their lips that they would not repeat upon future trials their aforesaid confessions. Mr. Fitts did not state that he had promised these men immunity in order to secure their former testimony, but intimated that he had given them certain assurances in that direction which would be set at naught if their cases were to be then tried. Judge McComb thereupon refused to continue said cases for trial and ordered the trial thereof to proceed; whereupon Mr. Fitts moved a dismissal of the charges against these two defendants, which motion Judge McComb denied, and thereupon continued the trial of said causes to a later near-by day. Thereupon and on February 23, 1930, the petitioner herein broadcasted the utterances

which, as we have seen, are set forth in full in the first Vaillancourt affidavit. In the course of said utterances and after relating substantially the facts with relation to the proceeding in Judge McComb's court which are above summarized, after a heated commentary upon the attitude of certain newspapers in Los Angeles with relation to the trials of the several causes above referred to, and which had been either completed or were still pending in said court, the petitioner proceeded to state that he had information "before Judge McComb's court convened on last Friday morning that had assured me as to every step the judge would take at that time, . . . nor was I misled in my conclusion. In fact it was well known about the courthouse for several days preceding the court battle Friday morning that the outcome would be exactly what it was." In describing the attitude and action of Judge McComb upon that occasion the the petitioner stated: "But Judge McComb was adamant. Though Buron Fitts plead at times almost tearfully and at other times quite indignantly, the judge sat on the bench like a sphinx and every ruling was squarely against the district attorney." The broadcaster then proceeded to commend the attitute and action of Mr. Fitts in the premises, and to state that by his rulings thereon the judge "seeks to make the district attorney break his personal word and the word of the district attorney's office and try two men whom he has used as state's witnesses and whose testimony undoubtedly resulted in the conviction of the worst official offender against the law and decency that we have had in this country within a generation. The judge demands that the district attorney try these men in spite of the universal custom in such cases and in spite of the fact that he has to all intents and purposes promised them immunity because they appeared as state's witnesses.

"If Mr. Fitts shall proceed to prosecute Berman and Getzoff as per the order of Judge McComb, it will place the district attorney's office, as Mr. Fitts stated, where its word of honor given to men who give evidence by which corrupt public officials are prosecuted, would be worth nothing whatsoever. By such a course the district attorney's office would be forced to a position whereby and wherein it repudiates its own promises and stultifies its own word." The broadcaster then returns to his heated assault upon

the aforesaid newspapers, in the course of which he charged that Judge McComb had been an appointee of Governor Young and that Governor Young was being supported in his effort to secure his re-election by the specific newspapers against·which he was directing his passionate assault, while Buron Fitts was a candidate for Governor in opposition to Governor Young. He asserts that said newspapers will gleefully welcome the decisions of Judge McComb, which, according to the statement of Mr. Fitts, in the event that the Keyes and Davis cases should be reversed, would leave him helpless in retrying those cases, and would result in Mr. Keyes and Mr. Davis both going free. He then proceeds to state: ''We do not charge that Judge McComb is playing politics, but we do charge that the Los Angeles Record is playing politics and politics that is contemptible and vicious. We do not know the· mind of Judge McComb. We have no way of understanding his processes of reasoning. He may or may not be honest in his decisions. That is between him and his own soul. It is also between him and the people who have a perfect right to scrutinize his official actions and pass upon them at the ballot box. We make no comment as to Judge McComb. The people can do their own thinking and reaching their own conclusions.'' He proceeds to say: ''Affidavits have been filed charging the prejudice of Judge McComb and that must be passed upon before there can be further proceedings. In the meantime, the prosecution of a third public official hinges upon the outcome. These witnesses were to be used in this case, it being also a bribery case. The attorney for Getzoff arose in Judge McComb's court and stated that in view of the ruling of the judge he would advise his client not to testify, but to stand upon his constitutional rights. I understand that it will be impossible to convict without the evidence of this witness and that possibly Mr. Fitts will move the dismissal of the case rather than put the taxpayer to great expense with no possibility of a conviction. That much for what seems to have already resulted from the decision of Judge McComb. We doubt not that the Record is overjoyed that at least one bribe-taking public official may have been freed.''

Regarding the discourse as a whole, it appears that the main burden of its criticism of Judge McComb,· would seem

to have consisted in an attack upon certain of his rulings in the cases of the two defendants before him, which might be said to have reached such a point of finality as to form a proper subject of comment on the part of any citizen, under the broad terms of the provision of the Constitution guaranteeing liberty of speech, and of the press. The court is divided in opinion upon this subject and has, therefore, concluded that as to this first count in the charge and commitment herein it would give to the petitioner the benefit of the doubt, and hence absolve him of contempt of court as to said first count in the accusation and as to the commitment based thereon.

The second affidavit presented by Vaillancourt embraces by recital not only much of the material which is set forth in the affiant's first affidavit, but proceeds to further set forth in full a succeeding address, delivered from his said pulpit, broadcasted by the petitioner through the medium of the same radio station, wherein the broadcaster further proceeded to discourse upon the judicial action and conduct of Judge McComb with regard to the matter detailed in the first affidavit. He asserts: ''If the case of Keyes and the case of Davis should be reversed and Judge McComb is successful in what he is enterprising, it means the turning loose of Asa Keyes and Buddy Davis on the streets of Los Angeles, free men. Some folks think that kind of a tragedy cannot come to pass, but it came to pass in San Diego county, and, by the way, I will just call your attention to the fact that thus our courts are functioning here, and not only here but as well all over the United States. No wonder a Supreme Court justice stated not long ago that such functioning of the courts of the land was a public disgrace, and that law-enforcement through our courts has become a matter of actual scandal, and he told why; because our judges dealt with technicalities, points of law, infinitesimal in their actual value to the public, and to the enforcement of the law, and let actual justice trail in the dust, and drag itself like some wounded thing along the streets.'' He further proceeds to say: ''I don't for a moment doubt the authority of Judge McComb or the authority of any other judge. Undoubtedly they have it, but undoubtedly when that authority was granted them by the people it was supposed that they would use it to further

the ends of justice and not to promote injustice. It was supposed they would use it to convict criminals and not to protect criminals. It was supposed they would use it for the bettering of the conditions of the citizens of the community who were sorely beset by lawless influences and not to embarrass and interfere with those who are righteously trying to put down crime in their community. Mark my words. It is high time that those who have the ballots in their hands decide that judges with all their power and authority must at least work for justice or else retire to the ranks of private life. I call your attention to the fact that with enough superior courts and municipal courts in session to make a flock, a bunch of bankers, brokers and usurers have been able to steal millions of dollars of the people's money and, by ruling after ruling of the courts, technical rulings, rulings as to insufficiency of evidence and all that kind of thing, these criminals now walk out gleefully, scot free.'' After some complimentary reference to Buron Fitts, the broadcaster proceeds to say: ''But it is a mighty poor bit of encouragement that he is having when a court deliberately gives him to understand that before he can go to work and gather his evidence he must come up and get on both knees, twine his fingers together and pray to the judge as if he were a god, and ask him whether or not he can do this, that or the other thing. A mighty poor policy!''

Regarding this discourse also in its entirety we find that aside from its repetition of the former criticism of the rulings of Judge McComb with regard to the cases of Berman and Getzoff, the broadcaster goes much further than he had done in his previous discourse, to the extent of launching a general assault, both expressly and by innuendo, upon the court and judges of Los Angeles County, with the particular desire of influencing their attitude and conduct respecting the so-called Julian cases then pending and undetermined in said court and before certain judges thereof, including Judge McComb. We have no doubt that the manifest purpose and import of this address was that of creating such an atmosphere of distrust and suspicion in the public mind as would have the effect of influencing the mind, will and eventual action of said court and the judges thereof with respect to said causes then pending and undetermined before them. That such a course of conduct

and utterance on the part of this petitioner constituted contempt of court we entertain no doubt.

In the third of the affidavits of Vaillancourt filed upon the same date as the other two a somewhat different situation is presented. It appears therefrom that during the times mentioned therein, Walton J. Wood was the presiding judge of the master calendar department of the criminal division of said superior court, and that as such it was his duty to assign and reassign criminal cases for trial to the various criminal departments of said superior court, and from time to time as the occasion warrants or demands to transfer such causes from one criminal department to another; that on or about March 25, 1930, said Walton J. Wood as such presiding judge made and caused to be entered an order setting criminal actions numbered 40108, 40110 and 40111 for trial before Marshall F. McComb as judge of said superior court; that thereafter and on March 27, 1930, said Walton J. Wood, as such presiding judge, made and caused to be entered an order transferring said actions and each of them from the department of said Marshall F. McComb to the department of Emmett H. Wilson, another judge of said court, for trial; that in the event said Emmett H. Wilson should not for any reason whatsoever be able to preside at the trial of said criminal actions, or any of them, it will become the duty of Walton J. Wood as such presiding judge to reassign and retransfer for trial said actions, or any of them, which said Emmett H. Wilson might be unable to try, to himself, to Judge McComb, or to another judge of the superior court. The affidavit further proceeds to set forth that at the times mentioned therein there had been duly impaneled and acting in and as a part of said superior court a grand jury which was during said time continuously engaged in investigations of alleged criminal offenses committed within said county and had been holding periodical and almost daily sessions in such behalf. The affidavit proceeds to state that the petitioner herein on the evening of March 27, 1930, broadcasted another address dealing with Judge Marshall F. McComb and with the foregoing action of Judge Walton J. Wood with respect to said criminal cases, which cases, it may be said, were certain of the so-called ''Julian'' cases wherein certain defendants, indicted for the aforesaid conspiracy to violate the Corporate

Securities Act, were to be put upon trial. It would seem that in the meantime Judge McComb had withdrawn voluntarily from trying any of the Julian cases, and that it was for that reason that Judge Wood had withdrawn said cases from Judge McComb's department and had, as above shown, transferred the same to the department presided over by Judge Wilson. The broadcaster proceeded to compliment Judge McComb in thus "voluntarily effacing himself as far as these cases are concerned. However, this does not excuse Judge Walton J. Wood at all, for Judge Wood took the position that had not Judge McComb voluntarily withdrawn, he would have stood pat on the placing of these cases in Judge McComb's court, knowing that Judge McComb was under grave suspicion of the things that happened a few days back." The broadcaster goes on to say: "I say that Judge Wood has taken a stand that is as full of holes as a sieve, for Judge Wood knows, as well as he knows his name, that no man with one iota of suspicion resting upon his official attitude should try the Julian cases." He proceeds to state: "The people are grim faced. They want justice done and they want the law vindicated, and they want men punished, big and little, high and low, and they don't want any judge or any court or anybody else throwing a monkey wrench into the machinery, and for Judge Wood to appoint Judge McComb, knowing the relationship between Judge McComb and the district attorney's office, that is working so hard now for the indictment of these big Julian wreckers and for their conviction; I say, knowing that relationship, knowing that Judge McComb is an appointee of Governor Young, knowing Judge McComb's relationship to the Hearst newspapers and to the Los Angeles Record and to Kemper Campbell and to others who have been very, very intensely interested all along the line, knowing these things, for Judge Wood to send these cases over to Judge McComb is almost unpardonable." The broadcaster concludes his rather long discourse with the statement: "Now, people, watch the courts; watch Judge Wood; keep your eye right on him; watch all of them. It is a pathetic day when all of a sudden we have to keep our eye on the courts for fear they play crooked and contemptible games in which criminals, big and vicious, are released and let to prey upon the public. It is a pitiful

day, but we have sure got to do it; there is nothing else to do; we have got to do it. Keep your eye on the courts, watch them, and keep your eye on the district attorney's office."

The fourth affidavit in support of the accusation made against the petitioner was verified and filed by one Walter S. Cox, who, after repeating the preliminary averments made in said former affidavits, and after referring to the fact that the case of *People* v. *Berman, alias Bennett,* was on and after April 11, 1930, pending and undetermined in said superior court and in the department thereof over which Judge McComb presided, and after alleging that on or about April 11th Judge McComb, while acting as judge in said court, had remanded said Berman to the custody of the sheriff of Los Angeles County after fixing his bail at the sum of $250,000; and after reciting an application for a writ of *habeas corpus* had been made to the District Court of Appeal of the State of California, in and for the Second Appellate District, Division Two (*Ex parte Berman,* 105 Cal. App. 270 [287 Pac. 373]), on behalf of said Berman and for the purpose of obtaining his release from said custody, which writ had been issued by said appellate tribunal and made returnable at a date thereafter, proceeded to allege that while said matter was pending and undetermined in each of said tribunals, the petitioner had uttered and broadcasted over the aforesaid radio broadcasting station certain statements about and in relation to said action and to said court and to said Marshal F. McComb as judge thereof, of which the following are some of the utterances thus given publicity:

"And the lawyers and newspaper men; and the judges! and the judges! and the judges! They are doing everything on earth they can to shield this bunch of felons. Without their assistance Lewis and Berman could not have gotten started on their program of robbery and thievery. . . . When the Los Angeles Examiner, when Judge McComb, or these attorneys, or when the rest of them undertake to interfere with the district attorney in his efforts to put men like Flint in the penitentiary, I tell you they are playing a game good American citizens will not stand for. . . . I am going to say something else. When Judge McComb went back into the records and got a case—a case that some

newspaper boys had tipped him off was there—when Judge McComb goes back and gets a case which arises out of a record they used for no purpose in the world except to get Jack Bennett back with it from France—a case they had no thought of ever trying—no proof of it if they had gone to trial, but simply did it, knowing that they were going to have a plan to send him over the road, and used it to get him back here—when they dig up that case and put it on the records without even notifying the district attorney's office to have a representative present, or to be present, and set a quarter of a million dollars bail against a man already under a bond of $50,000 and making no effort to get out of the country, and nobody believing that he was going to get out—it is just as plain as the nose on a man's face as to why it was done, and who is behind it and as to the purpose of the doing of it? If there is anybody in this city who actually misunderstands it, I am fooled on the mentality of the people of this city. Now, if Judge McComb were one of these wild-eyed, hot-brained fellows who got so mad because Buron Fitts beat him on that other thing in the Supreme Court, and just was mad—if he did it just because he was mad, that would be one thing. But he isn't one of that kind. He is as cool headed and as clear visioned as any man who ever sat on the bench. What Judge McComb did the other day was premeditated, deliberate, studied and purposely done, and don't you forget it. When the courts of the country begin to interfere with the process of justice and the district attorneys who go to the bat to put men in the penitentiary where they belong, it is time that the taxpayers rose up and said something about it. Unfortunately, we did not have anything to say in the selection of Judge McComb. He is an appointee of Governor Young. There is a lot of politics mixed up in this thing, just as sure as you are sitting here tonight, and don't forget it—absolutely lots of it.''

The fifth affidavit in support of said accusation was also made by Walter S. Cox. After repeating by reference those preliminary matters which are set forth in the earlier affidavits it proceeds to state that on April 22, 1930, and prior thereto and up to the time of the making and broadcasting of the utterances to which said affidavit refers, there was pending and undetermined in the said superior

court and in the department presided over by Judge Mc-Comb a certain criminal action entitled *People* v. *Charles H. Coffey,* in which action the defendant was accused in two counts of violations of the Motor Vehicle Act, and in two other counts of violent assaults upon two certain persons, the four counts apparently having reference to the same incident, and that upon the appearance of Charles H. Coffey, to answer to these charges before Judge McComb he had first entered a plea of not guilty as to all of said counts, but that later and on April 14, 1930, he withdrew his plea of not guilty as to count 2 and pleaded guilty as to said count, and thereupon made an oral application for probation as to count 2 in said information; that while said matter, and particularly said application for probation was still pending and undetermined in said court and before said judge, the petitioner herein on April 22, 1930, broadcasted certain utterances with relation to said action, and also with reference to the rulings of Judge McComb in the matter of the fixation of bail in the Berman matter. Concerning the Coffey matter the broadcaster said: ''I want to ask Judge McComb why he permitted this fellow Coffey, who was held on two counts of hit and run and one count of drunk driving by Judge Turney, to plead guilty to one count of hit and run and apply for probation and have the rest of the counts dismissed? I talked some time ago on that question. One of the most terrible menaces we have out here in this city, I think, is this matter of the drunk driving charge. Judge McComb is a specialist on this proposition of bringing them to trial. He don't turn any of them loose, according to the record he is making. He don't want any immunity granted to anybody. He don't want any cases thrown out of court. He wants all of them tried by the law and evidence. I am going to ask Judge McComb whether or not it is true that this fellow Coffey came into court, and, without any evidence being brought in, pleaded guilty to a hit and run charge—the easiest one, you understand, to get by with from the standpoint of penalty—and he permitted him to escape trial on the second hit and run charge and a drunk driving charge. There is the real charge that we need to attend to in our courts. That is the thing that is imperiling these highways all over the city, with people being killed daily by drunk driving. I am

going to ask Judge McComb whether or not he permitted that thing to happen in his court and then permitted this man to apply for probation and so forth. An officer called me this afternoon and told me that those were the facts. If they are, all these fine eulogies we have seen in the Los Angeles Record and in the Hearst papers concerning this marvelous man, Judge McComb, who don't allow any of them to get by him, who absolutely makes them stand up to meet the law, and who makes them toe the mark—No immunity favors granted in this court. He tries them all and puts the stuff to them—I say all these nice things they have all said about him are going to have to fall with a dull thud if he really did this thing. Of course, I don't know whether he did or not, but I would be mighty glad to turn this radio over to him and he can tell us next Thursday night whether or not he did. We are all interested. Everybody is interested, because right now Judge McComb is before the public eye." Referring to the Berman matter the broadcaster said: "But there is this to say: That no more ludicrous thing ever happened in the superior court than when Judge McComb revived that old case, which I have already explained, and placed the bail at $225,000 or $250,000 against this fellow Bennett." The discourse proceeds at some length with the innuendo that the action of Judge McComb in the premises was inspired by the newspaper enemies of Buron Fitts.

The sixth affidavit, also made by Walter S. Cox, recites and re-alleges the preliminary matters which are set forth in the earlier affidavits, and then proceeds to set forth another broadcasted discourse of the petitioner on the evening of April 24, 1930, in which he takes up again the case of *People* v. *Coffey,* and after certain sarcastic references to Judge McComb's disposition to hold drunk drivers strictly to account, proceeds to say: "Yet with this fellow Coffey, who, I understand, is a high Mason and a big Elk—and by the way that has nothing in the world to do with drunk driving, and I hope the judge will understand that, I hope he understands the fact that he is an Elk and a Mason does not keep bootleg liquor from making him drunk. Not at all. He is quite a wealthy man, I think, but that does not mitigate the offense in the least, as I see it. He takes those three offenses and on one of them, the least one, carrying the

least sentence or penalty, he permits him to plead guilty and make an application for probation. Of course this probation business is up to him. I have no comment to make on that. This is the judge's funeral; it is not mine. Let me tell you this: Judge McComb is going to have to do some explaining. . . . Now, he stands up and takes this fellow with three crimes charged against him, forgets about the one that would carry the greatest punishment, the drunk driving, takes the least charge—dealing with this big Mason, this big Elk and influential man among us—and lets him plead guilty and apply for probation. That does not look very beautiful, and it doesn't smell good, either."

The seventh and last affidavit, also verified by Walter S. Cox, deals with a different situation. It proceeds to set forth that at the times mentioned therein there was a duly impaneled and acting grand jury, functioning as a part of the Superior Court of Los Angeles County, and engaged in investigating criminal offenses and alleged misconduct on the part of public officers, committed within said county, and holding protracted and almost daily sessions therein; that on or about April 24, 1930, the petitioner broadcasted a discourse with relation to certain matters which were either pending before or were about to be brought to the attention of said grand jury. Among these was the investigation of certain acts and conduct of Sheriff William I. Traeger of said county. In dealing with this subject the petitioner proceeded to set forth certain matters alleged to have come to his personal attention and which, if true, would constitute grave personal improprieties amounting probably to official misconduct on the part of Sheriff Traeger, and in relation thereto stated that he had had a conversation with one of the members of the grand jury who had stated to him that there would be no investigation of Sheriff Traeger by the grand jury. The petitioner proceeded to state his understanding of the charges against Sheriff Traeger and to suggest that there was some sort of understanding between the sheriff and the grand jury by virtue of which its members would not proceed further with the charges against him, and, after referring to this matter at considerable length, he states: "Now, isn't it a pretty mess that we are in when we have a mutual treaty between the sheriff's office and the sheriff—I mean the sheriff and the grand jurors, by which

the sheriff is not to drink any more, not to run for re-election, and therefore they will let him alone?''

In each of the affidavits above referred to there is em-. braced and reasserted the charge against the petitioner that the statements therein contained naturally tended and were calculated to and were spoken, announced, uttered, published and broadcast by the said petitioner for the purpose and with the intent that they should and would interfere with, influence, sway, control and intimidate the said superior court, the said grand jury, and also interfere with, influence, sway, control and intimidate any persons who might be called upon to testify as witnesses in the certain specified matters pending before said court and said grand jury, and by so doing interfere with the orderly and due performance of duty on the part of said court and of its several judges and grand jurors, and with the orderly and due administration of justice.

When the foregoing matters, together with the answer thereto made and filed on behalf of the petitioner, came on for hearing before said superior court and before a department thereof presided over by Superior Judge Tappaan, a hearing was upon May 2, 1930, had thereon, and the matter having been submitted to the said court and the said judge thereof for decision, the said court on the fifth day of May, 1930, made and entered, as hereinabove stated, its judgment and commitment, adjudging the petitioner to be in contempt of court upon each of the aforesaid seven counts, and with respect thereto made and entered the following judgment: As to the first count the court adjudged that the petitioner be punished for the contempt specified therein by imprisonment in the county jail of the county of Los Angeles for the period of five days. As to the second count, that the petitioner be punished for the contempt specified therein by fine in the sum of $50 and in default of the payment of said fine that the petitioner stand committed to the sheriff of the county of Los Angeles until such fine is paid, and that he be imprisoned in the county jail of said county for a term which shall be one day for each two dollars of said fine or unpaid part thereof. As to the third count, that the petitioner be punished for the contempt specified therein by imprisonment in the county jail of the county of Los Angeles for the period of five days. As to

the fourth count, that said petitioner be punished for the contempt set forth therein by a fine in the sum of $50, with the same alternative as that provided for in the second count. As to the fifth count, that the petitioner be punished for the contempt specified therein by imprisonment in the county jail of the county of Los Angeles for the period of five days. As to the sixth and seventh counts, that the petitioner be punished for the contempt specified in the affidavits in support thereof by imprisonment in the county jail of the county of Los Angeles for the period of five days, and that said terms of imprisonment above referred to should run consecutively.

The petitioner, as we have seen, having served a portion of the terms of imprisonment provided for in the foregoing judgment and commitment, and having offered to pay into court the amount remaining due upon the fines therein imposed, made application for release upon *habeas corpus*, which having been granted and the matter coming on for hearing upon its merits and having been heard, the questions involved therein are submitted to this court for its decision.

It is the first contention of the petitioner that the contempt or contempts complained of having been committed out of the presence of the court, consisting of a series of broadcasted utterances allegedly reflecting upon or concerning the court and one or more of its judges, it is beyond the power of the court reflected upon to punish him for contempt. This contention is predicated upon the provisions of subdivision 13 of section 1209 of the Code of Civil Procedure, which reads as follows: "But no speech or publication reflecting upon or concerning any court or any officer thereof shall be treated or punished as a contempt of such court unless made in the immediate presence of such court while in session and in such a manner as to actually interfere with its proceedings." The foregoing contention of the petitioner requires but brief consideration, in view of the fact that in the case of *In re Charles M. Shortridge*, 99 Cal. 526, 532 [37 Am. St. Rep. 78, 21 L. R. A. 755, 34 Pac. 227, 230], the foregoing subdivision of said section of the Code of Civil Procedure came before this court for consideration as to the constitutionality of its provisions, and it was therein expressly held that courts of justice have the inherent right to punish as a contempt an act—whether

committed in or out of its presence—which tends to impede, embarrass or obstruct the court in the discharge of its duties; and that the legislature had no power to enact the foregoing amendment (Stats. 1891, p. 7) to said section of said code in so far as it was attempted thereby to deprive the court of power, in the exercise of its aforesaid inherent right to punish as a contempt any act, speech or publication which had for its manifest purpose and obvious tendency an interference with the orderly administration of justice in causes pending before such courts. The foregoing decision of this court has been consistently followed and approved in later cases. (*McClatchy* v. *Superior Court,* 119 Cal. 413 [39 L. R. A. 691, 51 Pac. 696]; *Lamberson* v. *Superior Court,* 151 Cal. 458, 461 [11 L. R. A. (N. S.) 619, 91 Pac. 100]; *In re Lindsley,* 75 Cal. App. 122, 124 [241 Pac. 934]; *Lindsley* v. *Superior Court,* 76 Cal. App. 419 [245 Pac. 212]; *In re Arnold,* 204 Cal. 175 [267 Pac. 316]; *Blodgett* v. *Superior Court, ante,* p. 1 [71 A. L. R. 482, 290 Pac. 293].)

The petitioner's second contention is to the effect that the matters and things set forth in the several affidavits which formed the basis of the accusation that the petitioner upon the various and separate occasions as recited in said affidavits was guilty of acts and conduct constituting a contempt of court, do not amount, as to either the facts set forth therein or the law applicable thereto, to such contempt. We are unable to give our concurrence to this contention as to the several counts in said accusation other than the first count thereof. We have hereinabove undertaken to set forth in detail the several judicial proceedings which at the time of the petitioner's aforesaid utterances were pending and undetermined in said superior court and in one or other of the departments presided over by the several judges whose acts and conduct with respect to such pending cases were animadverted upon by the petitioner in his several broadcasted utterances. The cases of *People* v. *Berman* and *People* v. *Getzoff*, at the time of the utterances of the petitioner set forth in the second of said affidavits under the title of count two of said accusation, were in the actual course of coming on for trial before Judge McComb in department 45 of said court. It is true as to the content of the first count in said accusation the matters chiefly adverted to by the petitioner related to certain rulings

already made by Judge McComb which may have been a proper subject of his animadversions. It is also true that the defendants in said action had each made application for release upon *habeas corpus* to the District Court of Appeal, which applications had at the time of the petitioner's aforesaid utterances been undetermined in said court. But this fact did not interfere with the fact that each of said causes was pending before the superior court and that in each thereof the questions as to whether said defendants should presently be put upon trial and as to the rulings of the trial judge during the course thereof were each and all matters which the presiding judge of said department of said court was required to consider and pass upon in the orderly course of the administration of justice as to these causes and the questions involved therein at the very time that the petitioner's utterances, as set forth in detail in count two of said accusation, were made. We entertain no doubt that the utterances of the petitioner, under the circumstances above detailed, had for their obvious intent and purpose that of causing said court and the judge to adopt the attitude which the broadcaster was insisting upon within relation to the present and future conduct of said causes before said court; and that the petitioner in order to accomplish this result was making use of his position as a minister and of his opportunity as a broadcaster and of his influence as an orator and of his access, through his aforesaid position and powers, to the public mind, to compel said court and the judge thereof to a course of action and conduct with respect to such pending causes in accord with the petitioner's views. In seeking to achieve this result the petitioner commingled in his aforesaid utterances, as set forth in count two of said accusation, a severe arraignment of said court and the judge thereof, as to rulings already made, and to be thereafter made, with respect to the conduct of said causes during the impending trial thereof, together with an assault, both expressly and by innuendo, upon the motives of Judge McComb and upon his personal and political affiliations as affecting his past, present and future acts and conduct with respect to said pending causes and to other interlocked judicial proceedings which were also in a state of pendency in said court. The foregoing animadversions were coupled with both the ex-

pressed and covert threat of injurious consequences to be visited upon Judge McComb in the event of his continuance to act as the trial judge in said pending causes and to maintain unchanged his attitude with relation to the conduct and disposition thereof. These consequences were to become operative through the creation of an adverse and inflamed public opinion which petitioner by his aforesaid utterances was plainly seeking to arouse and intensify.

With respect to the utterances of the petitioner as set forth in the third count of said accusation, and as affecting the aforesaid pending causes, and also these other and more or less interlocked criminal actions also at said time pending in said court, and as affecting the judicial attitude not only of Judge McComb with relation thereto, but also of Judge Walton J. Wood, at that time presiding judge of the master calendar department of the criminal division of said court, and Judge Emmett H. Wilson, as one of the judges of said court, what we have heretofore said with respect to the obvious intent and purposes of the petitioner, as manifested in his aforesaid utterances, as detailed in counts one and two of said accusation, has full and precise application. The purpose of the broadcaster, as shown both expressly and by innuendo, was that of involving the several departments of the superior court then actually engaged in this or that phase of the judicial consideration of said pending causes, in such an atmosphere of suspicion as to the affiliations and attitude of the judges mentioned as would have the effect of compelling them and each of them to conform their rulings to the demands of the petitioner, or to suffer the results of an inflamed public opinion injuriously affecting them and each of them in the event of a noncompliance with the petitioner's demands.

With respect to the matters set forth in the affidavit of Walter S. Cox embraced in the fourth count of said accusation, a like conclusion seems irresistible. The assault upon Judge McComb, both by direct charge and covert innuendo, becomes increasingly intensive. When the broadcaster states that, "What Judge McComb did the other day was premeditated, deliberate, studied and purposely done, and don't you forget it. When the courts of the country begin to interfere with the process of justice and the district attorneys who go to the bat to put men in the penitentiary where

they belong, it is time that the taxpayers rose up and said something about it," it is idle to argue that the intent and purpose of such an utterance as this was not precisely that set forth in the charging part of said accusation.

In the affidavit of Walter S. Cox, which forms the foundation for the fifth count in said accusation, another criminal proceeding, namely, that of *People* v. *Coffey*, pending in the department of the superior court over which Judge McComb presided, is made the subject of the broadcaster's animadversions. This cause at the time thereof was pending in said department and before Judge McComb, the immediate matter before said court being the question as to the propriety of the admission of the said defendant to probation upon his application therefor, which had not yet been determined before said judge and court. The petitioner in his extended comment upon the situation in said cause, still pending, proceeded to discuss at length and from a most partisan viewpoint the nature of the case against the defendant and the conduct thereof under the direct administration of Judge McComb, the innuendo of the broadcaster's commentary being that Judge McComb, contrary to his past custom of treating with severity violators of the Motor Vehicle Act, was acting with deliberate partiality in the Coffey case, and that his action in that regard was of the same unworthy quality as that which had already characterized his theretofore criticised conduct in the case of Berman and Getzoff.

In the sixth count of said accusation the petitioner is shown in a subsequent broadcast to have again referred to the Coffey case, and in the course of such reference, and while said cause was still pending upon the defendant's application for probation before Judge McComb, to make the direct charge that the judicial action and attitude of Judge McComb with respect to the case against Coffey is being influenced by the fact that the defendant is a high Mason, a big Elk, and a wealthy man, and that by reason thereof, "Judge McComb is going to have to do some explaining."

We have thus far been dealing with the several broadcasted utterances of the petitioner having chiefly to do with the course of pending proceedings in the superior court in the several criminal causes committed to the department

thereof over which Judge Marshall F. McComb presides, and with respect to which those certain other judges referred to by the petitioner in his aforesaid utterances have been and may yet be called upon to exercise judicial functions.

We are entirely satisfied that the broadcasted utterances of the petitioner with respect to the foregoing matters involved in pending proceedings in said court and before the said judges thereof, disclose throughout the existence on the part of the petitioner a persistent and intentional purpose to impose his own will and views with respect to said causes and the facts, the law and the conduct thereof, upon the said superior court, and not only the judges thereof particularly mentioned, but all of the judges thereof, and that such result was contemplated and intended to be achieved by the petitioner through his aforesaid public utterances, embodying his strenuous and repeated asseverations as to the facts and the law relative to these several causes, commingled with assaults, both express and by innuendo, upon the motives and integrity of the several judges having these matters in charge, and with threats of the injurious consequences to them of an adverse public opinion which, by means of his reiterated utterances, he was seeking to create. That such acts and conduct on the part of this petitioner constituted contempt of court we entertain no doubt. ▮ The constitutional guaranties of freedom of speech and of the press do not, in our opinion, and in the light of the authorities which we are about to cite, go so far as to protect the citizen in making such comment by either spoken or printed utterance with respect to causes pending before courts of justice, as have for their purpose and manifest tendency an attempted interference with the orderly administration of justice before such tribunals and in respect to causes pending and in course of conduct therein. No difference can be discerned between the rights of the citizen and the proper limitation thereof under his aforesaid constitutional guaranty, whether that citizen be a minister speaking from his pulpit, or a broadcaster through the radio, or an editor through his newspaper, or a curbstone orator from his soap box, or an anarchist from whatever forum he may find for the exploitation of his doctrines, the right and the limitation thereof being the same when the

matter involved in the utterances of all or any of these affects or manifestly tends to affect the orderly administration of justice in pending causes before judicial tribunals and the judges thereof.

In the case of *In re Shortridge, supra,* this court epitomized the foregoing conclusions in the following apt words: "Liberty of the press must not be confounded with mere license. Liberty of the press stops where a further exercise would invade the rights of others. This provision of the constitution does not authorize a usurpation of the functions of the courts. Under the plea of the liberty of the press a newspaper has no right to assail litigants during the progress of a trial, intimidate witnesses, dictate verdicts or judgments, or spread before juries its opinion of the merits of cases which are on trial. As stated before, what may be spoken may be written, and the converse of the proposition is true that what may not be spoken under such circumstances may not be written." In the case of *People* v. *Durrant,* 116 Cal. 179, 209 [48 Pac. 75, 82], this court again put into apt and terse language its views upon this subject as follows: "A publication during the course of a trial which reflects 'on the court or assails the litigants or seeks to intimidate witnesses, or spreads before the jury an opinion upon the merits of the controversy, or threatens them with public odium, or attempts to dictate the decision, or in any improper way endeavors to influence the determination, is unquestionably a contempt of court." In the case of *Patterson* v. *Colorado,* 205 U. S. 454 [10 Ann. Cas. 689, 51 L. Ed. 879, 27 Sup. Ct. Rep. 556, 558], Mr. Justice Holmes says: "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print. What is true with reference to a jury is true also with reference to a court. . . . Judges generally, perhaps, are less apprehensive that publications impugning their own reasoning or motives will interfere with their administration of the law. But if a court regards, as it may, a publication concerning a matter of law pending before it, as tending toward such an·interference, it may punish it as in the instance put. When a case is finished, courts are subject to the same criticism as other people, but the propriety and

necessity of preventing interference with the course of justice by premature statement, argument or intimidation can hardly be denied.''

It is one of the contentions of the petitioner that this contempt proceeding must fail for the reason that it is nowhere stated or found therein that the public utterances of the petitioner with respect to the several causes and proceedings and to the judicial officers engaged therein were not the truth. To this contention Mr. Justice Holmes, in the case last above cited, furnishes a complete reply when he states: ''In the next place, the rule applied to criminal libels applies yet more clearly to contempts. A publication likely to reach the eyes of a jury, declaring a witness in a pending cause a perjurer, would be none the less a contempt that it was true. It would tend to obstruct the administration of justice, because even a correct conclusion is not to be reached or helped in that way, if our system of trials is to be maintained. The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.''

We do not intend to state or intimate in this opinion that the acts and conduct of courts with respect to matters in which they have performed their functions or exercised their judgments are not, subject to the laws touching libel and slander, to be freely and fully subjected to both private and public comment and criticism on the part of every person or group of persons, whatever may be their station or instrumentalities of expression in our body politic, and whatever effect the comments, utterances and expressions of these or any of these may have in the formation of either a friendly or an adverse public opinion. It is only when such expressions or utterances, in whatever form or forum, have for their intent, purpose and manifest tendency an interference with the orderly administration of justice in pending causes that they can be held to so far exceed the constitutional boundaries to freedom of speech and of the press as to constitute contempt of court under the statutes of this state defining the same.

It is not essential, in order to constitute such contempt, to show that the actions of the court or of the judge thereof were actually influenced by the public utter-

ances of the petitioner herein complained of. In the case of *Sinclair* v. *United States,* 279 U. S. 749, 764 [63 A. L. R. 1258, 73 L. Ed. 938, 49 Sup. Ct. Rep. 471, 476], it was aptly stated by Mr. Justice McReynolds, in delivering the opinion of the court, that ''it is said there is no proof that the mind of the judge was influenced or his purpose to do his duty obstructed or restrained by the publications and, therefore, there was no proof tending to show the wrong complained of. But here, again, not the influence upon the mind of the particular judge is the criterion but the reasonable tendency of the acts done to influence or bring about the baleful result is the test. In other words, having regard to the powers conferred to the protection of society, to the honest and fair administration of justice and to the evil to come from its obstruction, the wrong depends upon the tendency of the acts to accomplish this result without reference to the consideration of how far they may have been without influence in a particular case. The wrongdoer may not be heard to try the power of the judge to resist acts of obstruction and wrongdoing by him committed as a prelude to trial and punishment for his wrongful acts.''

We have thus far dealt with the acts, utterances and conduct of the petitioner as the same are set forth in the first six counts of the accusation against him and in the findings, conclusions and commitment of the trial court with relation thereto.

With respect to the seventh count in the accusation, but brief comment is required. The grand jury is an instrumentality of the courts of this state, and as such is charged with a *quasi*-judicial inquisition into the conduct of citizens and of public institutions and officials, and is to be as fully protected in the exercise of its powers and functions in that regard as the courts themselves. Whatever, therefore, manifestly tends and is intended to constitute an interference with the proper exercise of the duties and functions of a grand jury while engaged in the consideration of such matters as may properly come before it, would obviously amount to a contempt of court. We entertain no doubt that the broadcasted utterances of the petitioner as set forth in count seven of said accusation, and as above recited with sufficient of detail, amounted to such contempt as would have subjected him to the pains and

penalties thereof provided by law. In view of the fact, however, that the broadcasted utterances of petitioner · in the foregoing regard formed a portion of a single address delivered by him, as hereinabove set forth, the trial court saw fit to consider such address as constituting a single act of contempt and to fix the penalty therefor accordingly.

It is the contention of the petitioner that the trial court in passing upon the accusation made against him ought to have treated the entire contempt of all of his several utterances as constituting but one contempt, and subject, as such, to but the single, or at most double, penalty provided and limited by law for the punishment of a contempt of court. We are unable to accede to the petitioner's contention in the foregoing regard. The several broadcasted addresses of the petitioner occurred upon different dates and were delivered, of necessity, therefore to different audiences, and dealt in the main with different phases of the proceedings then pending in the courts and before the judicial officers against which his animadversions were in each instance directed. They therefore, in our opinion, each constituted a separate offense and were properly dealt with as such by the trial court. The petitioner makes the final contention that, conceding this to be true, the trial court was still in error in making its judgment and commitment, and the punishment prescribed thereby, run consecutively instead of concurrently, in conformity to what it is insisted the law relative to such judgments and commitments intends. In making this contention, counsel for the petitioner concedes that section 669 of the Penal Code relative to concurrent penalties does not apply to cases of contempt, in view of the provisions of section 11 of the Penal Code. It is, however, insisted that, in the light of these provisions of the Penal Code, there is no law in California permitting consecutive sentences in contempt cases. No authorities, however, are cited on behalf of the petitioner in support of this contention. But from the briefs and arguments of counsel for the respondent herein it appears that from an early date in our judicial history courts have claimed and exercised the right to impose consecutive sentences in contempt cases, and have been upheld in that regard by the court of last resort. *People* v. *Forbes,* 22 Cal. 135, is the earliest, and *Lindsley* v. *Superior Court,* 76 Cal. App. 419 [245. Pac.

212], is the latest decision of our appellate tribunals upholding this power and its exercise on the part of trial courts. The case last cited is instructive in its practical identity with the instant proceeding and in its exhaustive citation of authority in support of its conclusions. The case of *Solano Aquatic Club* v. *Superior Court*, 165 Cal. 278 [131 Pac. 874], is also instructive in its statement of what we deem to be the settled law with respect to the separate and consecutive penalties to be imposed upon several, though consecutive, acts, each amounting to a contempt of court.

The record herein discloses that the petitioner, prior to his application to this court for a writ of *habeas corpus* and to the granting of said writ, with the consequent release of the petitioner pending a hearing thereon, had been imprisoned for a period of the fifteen days covered by the four terms of five days each provided for in the aforesaid judgment and commitment, and that in addition thereto the petitioner in his application for said writ had offered to pay whatever portions of the fines imposed upon him should be found to remain due under his contention that but a single penalty for a single contempt should have been imposed. It appears, therefore, that, eliminating the penalty imposed under the first count in said accusation, he has served the periods of imprisonment lawfully imposed under said commitment, but that the fines imposed by the consecutive penalties thereof remain unpaid.

It is, therefore, ordered that the proceedings under and in conformity with the writ of *habeas corpus* heretofore issued herein be and the same are hereby discharged, and that the petitioner be and he is hereby remanded to the custody of the respondent herein.

Preston, J., Waste, C. J., Curtis, J., Seawell, J., Shenk, J., and Langdon, J., concurred.