[Crim. No. 3834. In Bank.—October 11, 1934.]

In the Matter of THE SAN FRANCISCO CHRONICLE et al., in Contempt.

Sullivan, Roche, Johnson & Barry, Theodore J. Roche and Percy E. Towne for Respondents.

WASTE, C. J.—This proceeding in contempt against respondents was instituted by the filing of affidavits by William H. Waste, Chief Justice of the Supreme Court of California, and B. Grant Taylor, clerk of said court. Based on these affidavits, the court ordered respondents to show cause why they should not be punished for contempt. The respondents filed answers in the form of affidavits, and have

agreed that the case may be determined upon the affidavits on file herein.

The affidavit of B. Grant Taylor, so far as pertinent here, recites that on September 10, 1934, and prior thereto, there was pending in the Supreme Court an appeal entitled *"People of the State of California, Plaintiff and Respondent,* v. *David Lamson, Defendant and Appellant"*, which appeal on said date and prior thereto was undetermined by the Supreme Court; that on September 10, 1934, respondents caused to be published in The San Francisco Chronicle an article referring to the Lamson case. The article is set forth in full in the affidavit. The article states that the Supreme Court has voted to reverse the decision of the trial court in the Lamson case. The following statements appearing in the article are particularly referred to as being false and untrue:

1. "Lamson Wins New Trial!"

2. "Supreme Court acts to Nullify Death Sentence."

3. "Lawyers' appeal Charging Prejudice in San Jose Trial Gains Point for Stanford Executive in Shadow of Gallows."

4. "David Lamson has won a new trial."

5. "The Supreme Court of California has voted to reverse the trial court and jury which 12 months ago found the young Stanford Press Executive guilty of the 1933 Memorial Day murder of his wife Allene and condemned him to death."

6. "This was learned by The Chronicle last night from confidential and authoritative sources.

7. "The Supreme Court justices are reported to have based their reversal on three points:

"1. That George P. Peterson, foreman of the trial jury, was a Santa Clara county deputy sheriff at the time he voted to send Lamson to the gallows.

"2. That Lenora Ghetti, matron of the Jury, indulged in prejudicial activities detrimental to Lamson's cause.

"3. That Superior Judge Robert R. Syer, who presided over Lamson's trial, erred in ruling out certain testimony of E. O. Heinrich, noted criminologist and ace technical witness for the defense."

8. "The decision granting Lamson a new trial was written by Justice William H. Langdon. . . . "

9. "Justice W. H. Langdon writes decision."

10. "David Lamson Given another Day in Court."

The affidavit alleges that each of the above statements was false in that on September 10, 1934, and prior thereto, the Lamson case was then pending in the Supreme Court, and had not been reversed or otherwise decided by the court; that no opinion had on that date been prepared by any member of the court and that the court on or prior to that date had not voted to reverse or in any other way to decide the Lamson case; that the article constituted the publication of a false report of the proceedings of the Supreme Court; that the article naturally tended to and actually did:

1. Interfere with the orderly and due administration of justice in the Lamson case;

2. Bring into disrepute the Supreme Court and expose the court to public disfavor, distrust and suspicion;

3. Untruthfully indicate to the readers of the San Francisco Chronicle that that newspaper had an authoritative source of information close to the Supreme Court not open to other newspapers or to the public generally;

4. Unlawfully interfere with the proceedings of the Supreme Court; and

5. Impede, embarrass and obstruct the court in the discharge of its duties.

The affidavit of the Chief Justice re-alleges the facts set forth in the Taylor affidavit, and, in addition, alleges that in affiant's capacity as Chief Justice, it is his duty to assign the various causes pending in the Supreme Court to the particular justice who is to prepare the opinion in the cause; that on September 10, 1934, and prior thereto, he had not yet assigned the Lamson case to any justice of the Supreme Court; that on. that date, and prior thereto, said cause was pending before the court and had not been decided by the court; that on that date, and prior thereto, the court had not voted to reverse or in any other way to decide said cause; and that on that date, and prior thereto, no opinion had been prepared in said cause.

The answers of respondents, so far as substance is concerned, are almost identical. It is therein set forth that the respondents admit the publication of the article in question, but allege that the publication was made in good faith

upon information received by respondents which seemed to them "trustworthy". The answers all expressly admit that respondents have no authoritative source of information close to the Supreme Court not open to other newspapers or to the public generally. It is also alleged and admitted that respondents did not receive any portion of the information from any member of the Supreme Court, or from any officer or attache thereof. By failing to deny, it is admitted that the information contained in the article was false and untrue. It is also alleged that the San Francisco Chronicle, one of the named respondents, is not a legal entity, but is the name of a newspaper printed and published by the corporate respondent, Chronicle Publishing Company.

■ On this showing, respondents argue that they are not guilty of a contempt. It is seriously urged that under the provisions of section 1209, subdivision 13, of the Code of Civil Procedure, the publication of any article (whatever its contents) not in the physical presence of the court does not constitute a contempt. So far as pertinent here, subdivision 13 reads as follows:

"But no speech or publication reflecting upon or concerning any court or officer thereof shall be treated or punished as a contempt of court unless made in the immediate presence of such court while in session and in such a manner as to actually interfere with its proceedings."

The foregoing contention requires but brief consideration. That portion of section 1209 above quoted has many times been held unconstitutional on the ground that the courts have inherent power to punish for contempts, whether of a direct or constructive nature, and that the legislature cannot constitutionally infringe on that power. (*In re Shuler,* 210 Cal. 377, 397 [292 Pac. 481]; *McClatchy* v. *Superior Court,* 119 Cal. 413 [51 Pac. 696, 39 L. R. A. 691]; *Lamberson* v. *Superior Court,* 151 Cal. 458 [91 Pac. 100, 11 L. R. A. (N. S.) 619]; *In re Lindsley,* 75 Cal. App. 122 [241 Pac. 934]; *Lindsley* v. *Superior Court,* 76 Cal. App. 419 [245 Pac. 212]; see, also, *In re Arnold,* 204 Cal. 175 [267 Pac. 316]; *Blodgett* v. *Superior Court,* 210 Cal. 1 [290 Pac. 293, 72 A. L. R. 482]; *In re Shortridge,* 99 Cal. 526 [34 Pac. 227, 37 Am. St. Rep. 78, 21 L. R. A. 755].) What was said by this court in *Briggs* v. *Superior Court,* 211 Cal. 619 [297 Pac. 3], in no way affects the rule above enunciated.

■ It was therein held that the legislature may, in the case of a constructive contempt, provide for the procedure by which such contempt shall be tried and punished, but that case did not hold that the legislature can determine what shall constitute a constructive contempt, or declare that certain acts shall not constitute a constructive contempt. There is obviously a fundamental difference between a statute merely regulating procedure, as was involved in the Briggs case, and one such as section 1209, *supra,* purporting to affect the power of the courts to punish for contempt.

The main charge is that the Chronicle knowingly published a grossly inaccurate and untrue report of a judicial proceeding, the case of *People* v. *Lamson, post,* p. 648 [36 Pac. (2d) 361], now pending before this court. The charge is not denied by respondents. The story is concededly false. Respondents admit that they received no information from this court or any of its officers or attaches, and that the source of the information upon which they acted was unnamed individuals having no official connection with the court. They made no attempt to verify this purported information by inquiry of the court or any of its staff, and offer no explanation for their failure to do so, save that such inquiry might have given competing newspapers an inkling of the story, and thus have spoiled their "scoop".

■ The position of respondents is that their mere statement, under oath, that they acted in good faith purges them of the alleged contempt. Similar is their contention that the proceeding is *quasi* criminal in character, and that the essential element of criminal intent is negatived by their sworn denial. It would indeed be a remarkable rule that in criminal prosecutions the sworn conclusion of the defendant that he meant no wrong would conclusively establish his innocence, in spite of his frank admission that he knowingly did the act complained of. There is no such rule in criminal prosecutions, and in proceedings for contempt this view has been repudiated by the great majority of American jurisdictions. The majority rule above referred to is especially applicable when, as here, the publication is not susceptible of two interpretations. (*Ex parte Bankhead,* 200 Ala. 102 [75 So. 478]; *Globe Newspaper Co.* v. *Commonwealth,* 188 Mass. 449 [74 N. E. 682, 3 Ann. Cas. 761]; *O'Flynn* v. *State,* 89 Miss. 850 [43 So. 82, 119

Am. St. Rep. 727, 11 Ann. Cas. 530, 9 L. R. A. (N. S.) 1119]; *Carson* v. *Ennis,* 146 Ga. 726 [92 S. E. 221, L. R. A. 1917E, 650]; *United States* v. *Shipp,* 203 U. S. 563 [27 Sup. Ct. 165, 51 L. Ed. 319, 8 Ann. Cas. 265]; *In re Providence Journal Co.,* 28 R. I. 489 [68 Atl. 428, 125 Am. St. Rep. 755, 17 L. R. A. (N. S.) 582].)

■ The publication of a false or grossly inaccurate report of the proceedings of any court constitutes a constructive contempt, the motive or intent of the publisher being immaterial, except in mitigation. Section 166 of the Penal Code provides in part:

''Every person guilty of any contempt of court, of either of the following kinds, is guilty of a misdemeanor: . . .

''7. The publication of a false or grossly inaccurate report of the proceedings of any court.''

■ Under this section, the act prohibited is both a contempt and a misdemeanor. The mere fact that the legislature has seen fit to declare such a contempt also a misdemeanor in no way deprives the court of the power to punish such an act as a constructive contempt in a summary proceeding such as this. (See *In re Morris,* 194 Cal. 63 [227 Pac. 914].)

■ The publication of the article in question also constituted a contempt in that it tended to create in the public mind distrust and suspicion of the court. The only possible inference from the statement appearing at the beginning of the article that news of the supposed reversal ''was learned by The Chronicle last night from confidential and authoritative sources'', is such that information had been secured from some member of the court or some officer or attache of the court. It matters little whether the reader infers that the Chronicle came by its special knowledge honestly, as a result of the court's deliberately favoring it with the first report on the case, or dishonestly, as a result of a justice or officer of the court disclosing the information deliberately or inadvertently. In either event, the reader would conclude from the article that the confidential proceedings of the court may be reached by a privileged newspaper; that the method of decision prescribed by law and followed by the court is not a barrier to an enterprising and powerful organization such as the Chronicle. That this tends to bring the court into wide

disrepute and is, therefore, contempt of court, cannot be doubted.

The publication of the article involved herein also constituted a contempt in that it tended to interfere unlawfully with the proceedings of the Supreme Court in the Lamson case. (See sec. 1209, subd. 9, Code Civ. Proc.)

The publication of any article, whether true or false, concerning a pending cause, that tends to impede the orderly administration of justice in that cause, constitutes a contempt, and the fact that the publisher believed it to be true is immaterial, except in mitigation of the punishment. (*In re Providence Journal Co., supra.*) It is also entirely immaterial that the article did not in fact influence the court, so long as the publication tended to obstruct justice. (*In re Shuler, supra; In re Lindsley, supra; United States* v. *Toledo Newspaper Co.,* 220 Fed. 458, affirmed 247 U. S. 402 [38 Sup. Ct. 560, 62 L. Ed. 1186]; *Ray* v. *State,* 186 Ind. 396 [114 N. E. 866].) The article necessarily tended to arouse a state of mind in the general public, and to influence public opinion, in such a way as to embarrass the court in the determination of the cause. In this respect, it has the same effect as one which directly attempts to arouse sympathy in favor of one side of the case. Of this latter type of publication it was said in *People* v. *Wilson,* 64 Ill. 195 [16 Am. Rep. 528, 533]:

"A court will, of course, endeavor to remain wholly uninfluenced by publications like that under consideration, but will the community believe that it is able to do so? Can it even be certain in regard to itself? Can men always be sure of their mental poise? A timid man might be influenced to yield, while a combative man would be driven in the opposite direction. Whether the actual influence is on one side or the other, so far as it is felt at all, it becomes dangerous to the administration of justice. Even if a court is happily composed of judges of such firm and equal temper that they remain wholly uninfluenced in either direction, nevertheless a disturbing element has been thrown into the council chamber, which it is the wise policy of the law to exclude.

"Regard it in whatever light we may, we cannot but consider the article in question *as calculated* to embarrass the administration of justice, whether it has in fact done

so or not, and, therefore, as falling directly within the definition of punishable contempts."

The showing in mitigation made by respondents falls far short of the desired result. It fails completely to establish their good faith. Respondents admit that the substance of the article was false and that the information did not come to them from any person connected with the court. All that is alleged is that some unknown persons gave respondents the information; that they believed it was true, and that the persons who furnished it were believed by them to be trustworthy. From this showing, respondents conclude that they acted in good faith. Such a showing in no way demonstrates their good faith. As previously stated, no attempt was made to check the information by communicating with any member of the court. The statement of respondents that they acted in good faith is simply a legal conclusion. Respondents have not seen fit to disclose to the court the facts and circumstances surrounding the securing of such information, nor have they seen fit to disclose the source of such information. The bare legal conclusion that they acted in good faith, without disclosing to the court all of the facts and circumstances, is not sufficient to mitigate the offense.

It, therefore, appearing that the order to show cause having issued and due return and appearance having been made by Chronicle Publishing Company, Chester H. Rowell, editor of the Chronicle, and W. D. Chandler, managing editor of the Chronicle, and no good cause having been shown why they and each of them should not be found in contempt and punished therefor, it is adjudged by the court that the Chronicle Publishing Company, Chester H. Rowell, and W. D. Chandler are, and each of them is, guilty of contempt of this court, as specified in the order to show cause and the accompanying affidavits, and that as punishment therefor the Chronicle Publishing Company shall pay a fine of five hundred dollars ($500), for which amount let execution issue, and Chester H. Rowell and W. D. Chandler shall each pay a fine of two hundred and fifty dollars ($250), and that, in default thereof, the individual respondents so defaulting shall stand committed to the sheriff of the city and county of San Francisco, and, until such fine is paid, shall be imprisoned in the county

jail of such city and county at the rate of one day's imprisonment for every two dollars of such fine.

Execution and commitment are, and each is, stayed for five (5) days.

Seawell, J., Curtis, J., Preston, J., Langdon, J., and Shenk, J., concurred.

THOMPSON, J., Concurring and Dissenting.—I concur and dissent. I concur in the decision in so far as it determines that respondents are guilty of contempt but I feel compelled to dissent from that portion which fixes the punishment. I am persuaded that the article was mistakenly published and published without due consideration of its effect upon the administration of justice, but I am also convinced that it was without animus of any kind, and without malice; that in fact it is contemptuous because of its falsity, and not because of an effort to impede, obstruct or hinder the administration of justice. I think, in view of these facts, and the further fact that, so far as I can discover, no similar case has occurred previously in California, the ends of justice will be fully served by the finding that respondents are guilty, which, in effect, constitutes a public reprimand. I think we may safely depend upon these respondents and others engaged in like enterprises being advised hereby, not to offend hereafter, but rather to assist within their proper sphere in the proper and due administration of justice.