STATE OF NEBRASKA V. HENRY H. LOVELL.

FILED JANUARY 4, 1929. No. 26808.

*O. S. Spillman, Attorney General,* and *George W. Ayres,* for the state.

*Henry H. Lovell, pro se.*

Heard before Goss, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and HOWELL, JJ., and REDICK, District Judge.

ROSE, J.

In a prosecution by the state in the supreme court of Nebraska, the attorney general by formal information charged Henry H. Lovell, defendant, with contempt of court. He was found guilty and for the offense charged the court imposed upon him a sentence of imprisonment in the Douglas county jail for a period of ten days.

Defendant wrote, printed, published and circulated in Nebraska an editorial or article of which the following is a copy:

"Court Cannot be Corrupted.

"Since Judge *Shepard's* decision in the case of *Price et al. v. W. A. Fraser et al.,* as officers of the Woodmen of the World, and the appeal of the case by the defendant officers to the Nebraska Supreme Court, the question has, of course, been widely discussed as to the possibility of a reversion of the decree by the Supreme Court when it is taken up as planned October 6th next.

"The Forum is confident that Judge *Shepard's* decree will be sustained and the order through its officers and the Globe Life Insurance Company through its officers, who have also been officers of the Woodmen of the World, required to restore to the treasury of the Woodmen of the World the approximately $2,000,000.00 of cash and other

assets which the Lancaster county court held were fraudulently and wrongfully used.

"Our opinion is, as any editorial opinion worth while always is, not a personal idea of the individual, but the maturely crystalized concensus of opinion of a large number of competent and honest minds, omitting, of course, naturally the attorneys directly interested on the other side. The almost unanimous opinion of the legal fraternity is that Judge *Shepard's* decision was entirely sound and will be promptly sustained by the Nebraska Supreme Court, but one idea differing from this has been expressed, and since this idea, quite extensively passed about, strikes so at the foundations of our government that we cannot ignore it. That gossip in flavored form suggests the thought that on some flimsy pretext or technicality enough members of the Nebraska Supreme Court can be influenced to reverse the decision of Judge *Shepard* and undo all the work that has been done by the plaintiffs and their attorneys in protecting the interests of the membership of the Woodmen of the World. The appellants, Mr. Fraser and his associates, through their attorneys, have filed their brief. It has been designated and we sympathize with that designation as one of the rankest pieces of pettifogging ever presented to the Supreme Court of Nebraska. The defendants, on appeal, have filed their answer and to the layman there would seem to be no occasion to worry but that the Supreme Court would promptly sustain Judge *Shepard.* The case, of course, must be decided by the Judges, and we prefer to withhold a detailed article showing the presentations of both sides of the case until we can announce the decision of the Supreme Court.

"But when a situation exists, built up through gossip or otherwise, that leads a man, not a philanthropist, to offer to bet that the Supreme Court will reverse Judge *Shepard* in this case, and asserts as the reason for his position that interests friendly to the Woodmen of the World gang are in a position to influence the Judges of our Supreme Court, it is time they were defended.

"We do not believe that Judge Thompson can be influenced in the slightest degree because his son has been temporarily or otherwise in the employ of one of the supposed supporters of Mr. Fraser.

"We do not believe that Judge Goss would be affected by the gestures of Mr. Bradshaw towards the social advancement of his daughter.

"We do not believe that Judge Howell is under such obligations to any interests favorable to Mr. Fraser that warrants a fear that he might be influenced in their favor.

"In fact we believe that the entire membership of our Supreme bench is representative of the people of Nebraska and not of any special interests and that the rights and the money interests of the thousands of our citizens constituting the local membership of the Woodmen of the World, as well as the grand total of approximately one-half million members, citizens of other states, are safe in the hands of the Nebraska Supreme Court.

"It would seem that the importance of the matter warrants as near immediate decision as is possible. The defendants on appeal have clearly and simply stated their case and no better move to more firmly establish the idea of the integrity of the court could be made than to have the decision handed down in advance of the coming general election."

The information in the contempt proceeding contains a copy of the newspaper article and charges that it was unlawfully and contemptuously written, printed and published by defendant with intent to hinder the due administration of justice in the pending suit. The publication appeared September 15, 1928, in *The Forum,* a monthly periodical or newspaper "Devoted," as indicated by its cover, "to the insurance interests of the public and the best elements of all branches of underwriting." Defendant was the writer, editor and publisher.

The pending suit to which the publication referred was a controversy between members and executive officers of the Woodmen of the World, a fraternal beneficiary society

carrying life insurance on its members. The complaining members were plaintiffs and the executive officers and the Globe Life Insurance Company were defendants. An issue raised by the pleadings was the misuse by the officers of fraternal funds or property to the extent of approximately $2,000,000 for the purpose of organizing the Globe Life Insurance Company to write what is called "Old-Line Life Insurance," as distinguished from fraternal insurance. The pending suit was one in equity, tried and determined in the district court for Lancaster county, Judge Frederick E. Shepherd, presiding. From a decree against the Globe Life Insurance Company and the executive officers of the Woodmen of the World, requiring them to restore the misappropriated funds, they appealed to the supreme court, where the case was pending for trial *de novo* September 15, 1928, when the editorial or article under consideration was published.

Defendant Lovell was cited to appear November 19, 1928, and show cause, if any, why he should not be punished for contempt. At the appointed time he appeared personally in open court and presented an answer in which he regretted he was not financially able to be represented by eminent counsel; admitted publication of the article in the September issue of *The Forum;* denied he wrote it unlawfully or contemptuously or to obstruct proceedings in the pending suit or to hinder the due administration of justice therein; denied he intended to be contemptuous or disrespectful toward the court; expressed regret, if the publication was susceptible to an interpretation not intended, and offered an apology in that event; asserted he had at all times the greatest respect for the supreme court and for each member thereof; relied on its justice and humanity to protect him from false accusations; prayed for acceptance of his apology, if he had inadvertently committed any offense, and for dismissal of the prosecution. He expressed his willingness to submit his defense on his answer and on oral statements in harmony with it, but he was reminded from the bench of the gravity of the accusa-

tion against him and on the court's own motion he was given until November 26, 1928, to procure counsel and to prepare for trial.

Upon the convening of the court at the time fixed he again stated he was not financially able to employ eminent counsel and asked permission to act for himself in making his defense. His right to do so was recognized. He did not produce any witness in his own behalf, but was called to the witness-stand by the state. In answering questions by the attorney general and by members of the court he gave under oath his own interpretation of the published article and explained in detail the motives and the intent that prompted him in preparing and publishing it. He also exercised the right of advocacy in his own behalf. In his testimony he admitted sole responsibility for writing and publishing the editorial as reproduced in the information; said the rumors published by him had been previously circulated; admitted he did not inquire at the sources of knowledge to ascertain the facts concerning the rumors published by him; justified publication of them to give assurance that the court would not be influenced by them in deciding the pending case; expressed confidence in and respect for the supreme court and for each member thereof; disavowed any intention to be disrespectful or contemptuous. Defendant also expressed the conviction that he intended to keep within his rights when making his comments on the court in connection with the pending suit and argued that his publication required an innuendo to make it contemptuous, that the information did not contain an innuendo, and that consequently his explanation and apology should be accepted and the prosecution dismissed.

If defendant in his testimony and explanation truly interpreted his intent and attitude, the publication and circulation of his editorial were nevertheless unlawful. The published article was of itself contemptuous. It gave the court, the litigants and the public, in unmistakable terms, an impression at variance with the author's expressed in-

tent and attitude. It asserted when and how the pending case should be decided by the supreme court. It meant that, before the November election, there should be an affirmance of the decree requiring defendants in the suit pending on appeal to restore to the Woodmen of the World approximately $2,000,000 in misappropriated money or property. When and how the appeal should be decided were questions for judicial determination. The opinion of the editor and "The maturely crystalized concensus of opinion of a large number of competent and honest minds," to which he referred, were not factors for judicial consideration in disposing of the appeal. The resort to "The almost unanimous opinion of the legal fraternity" to show the soundness of Judge Shepherd's decision was improper. The supreme court is required by statute to dispose of the appeal without reference to the conclusion reached in the district court. Comp. St. 1922, sec. 9150. Furthermore, the published rumors were all without foundation in fact. The deliberate purpose to influence the judgment of the supreme court cannot be explained away. Defendant knew the civil case was pending on appeal. The article so shows on its face. It shows also that he considered the publication an editorial. Defendant took liberties the litigants themselves could not lawfully take. Parties to a pending action are not permitted to influence the court or a member thereof privately or through the press on the merits of pending litigation. Publishers have no greater rights. On the merits of a contested case the parties are heard in the presence of each other in open court. This is the system provided by law. Objectionable interference by strangers pending litigation is forbidden.

The test of guilt in a prosecution like this is not necessarily found in the mental processes by which the publisher, according to his testimony, justifies his utterances. What the article itself expresses, the motive of the author thus disclosed and the effect intended are subjects of judicial scrutiny and consideration and may be sufficient to refute oral evidence of innocence and the intention to ex-

ercise a constitutional right. The issue is one of fact for the court. The published article, the answer prepared by defendant in his own behalf, his testimony on the witness-stand, his advocacy at the bar,. and his use and understanding of the English language show an intelligence and a mental acumen that make him answerable to the state according to the true import of what he wrote, published and circulated.

The freedom of the press vouchsafed by the Constitution implies the publisher's respect for the equal rights of others. One of those rights that the publisher is bound to respect is a litigant's privilege of appearing before an independent, impartial court for judicial redress, uninfluenced or embarrassed by contemptuous publications pending litigation. Under the Constitution this right is as sacred as the freedom of the press. By both state and federal Constitutions government is composed of distinct legislative, executive and judicial departments of equal rank. The judiciary is an independent tribunal to which the individual may resort whenever his property rights are invaded by private wrongdoers, by public agencies or by the legislative or executive departments. In controversies over rights guaranteed by the Constitution the individual stands before the court on an equality with government itself. The constitutional provision creating an independent judiciary is recognized by historians, philosophers and. statesmen as a vast contribution to the science of government. To preserve the purity, impartiality and independence of the court is a solemn duty that cannot be evaded without endangering all constitutional rights, including the freedom of the press.

Each member of the court has an abiding conviction that defendant's editorial and the published rumors will not affect his judicial conduct in the pending case. If that conviction is well founded, a proper disposition of the suit pending on appeal will not efface the evil arising from the contempt. A judicial decision should be free from even the suspicion of intimidation, coercion or other ex-

ternal influence. If the judiciary is happily unmoved by the editorial in determining the appeal, the litigants, the public and the respect due to the courts of justice must still be considered. Will the appellants have a suspicion that the court was intimidated or otherwise improperly influenced by the publication in the event of an affirmance in accordance with the editor's expressed view as to what the decision should be? If appellants prevail and the judgment against them is reversed will appellees have a suspicion that the court permitted indignation arising from the publisher's article to influence the decision? Will the public or the readers of *The Forum* suspect coercion of the court if the judgment is affirmed? Will the appellants suspect that the article condemning them was inspired by appellees? The editorial, if disregarded by the court, would have a tendency, at least, to arouse such suspicions and to lessen confidence in the judicial decision, whatever it may be.

The constitutional provision that "Every person may freely speak, write and publish on all subjects" is followed by the restriction, "being responsible for the abuse of that liberty." Const., art. I, sec. 5. Abuses of the press in commenting on pending litigation with a view to influencing judicial action have been rare. Punishment of publishers for contempt has seldom been imposed, but statutory and common-law power to do so has long been recognized and occasionally exercised. Comp. St. 1922, sec. 9189; *State v. Bee Publishing Co.*, 60 Neb. 282. The freedom of the press and its powerful agency in the evolution of just and efficient government are scrupulously protected by the court. *Howell v. Bee Publishing Co.*, 100 Neb. 39. This freedom, however, does not extend to contemptuous interference with pending litigation.

The evidence establishes the guilt of defendant beyond a reasonable doubt. This conclusion is wholly free from resentment or revenge. No fine has been imposed. Imprisonment is limited to ten days. This leniency is ex-

tended to defendant out of consideration for his pecuniary situation and the needs of his family.

SENTENCE ACCORDINGLY.