[L. A. No. 16928. In Bank.—January 31, 1940.]

THE TIMES–MIRROR COMPANY (a Corporation) et al., Petitioners, v. SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent.

[L. A. No. 16929. In Bank.—January 31, 1940.]

THE TIMES–MIRROR COMPANY (a Corporation) et al., Petitioners, v. SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent.

100

Cosgrove & O'Neil, T. B. Cosgrove and F. B. Yoakum, Jr., for Petitioners.

Elisha Hanson, Carey McWilliams, Charles J. Katz, Francis Biddle, Osmond K. Fraenkel, Gallagher, Wirin & Johnson, A. L. Wirin, William C. Ring and S. S. Hahn, as *Amici Curiae,* on Behalf of Petitioners.

J. H. O'Connor, County Counsel, Douglas De Coster, Chief Deputy County Counsel, S. V. O. Prichard, Deputy County Counsel, Allen W. Ashburn, Michael G. Luddy, Isaac Pacht and Arnold Praeger for Respondent.

CURTIS, J.—These two proceedings were on the December, 1938, calendar of this court, sitting in bank, with five regular justices and one justice *pro tempore* present. The cases were then argued by counsel for the respective parties and by one of the *amici curiae.* Thereafter and before any decision of either of said causes had been agreed upon, one of said justices died, and another of said justices declared his disqualification to participate in any decision that might be

rendered in either of said causes. In this situation, this court found that it was unable to procure the concurrence of the constitutional number of qualified justices, who had heard the argument, in a decision of either of said causes, and basing its order upon that ground, directed that said causes be placed upon a subsequent calendar for argument. This argument has been held, and the same counsel who argued these cases at their first hearing before this court were present and participated in the second argument before us.

The two proceedings present the same legal issues and substantially the same factual situation is present in each case, except as to the contents of the editorials which were the basis of the contempt charges filed against petitioners. The petitioners were adjudged guilty of contempt of court for the publication of certain editorials in the Los Angeles Times, a newspaper of general circulation published in the city of Los Angeles, and these proceedings were instituted to review the two orders of court adjudging them guilty of contempt. Each of the contempt proceedings was instituted by an affidavit presented to the Superior Court of the County of Los Angeles by J. Louis Elkins, secretary of the Los Angeles Bar Association, pursuant to the provisions of section 1211 of the Code of Civil Procedure, and was prosecuted by attorneys from said bar association under the provisions of part III, title V of the Code of Civil Procedure, entitled, ''Contempts''.

Petitioners contend that these proceedings are ''criminal actions'' and should be instituted in the name of the people of the State of California and prosecuted like any other criminal action by the district attorney of the county in which the offense was committed, and that the accused were entitled to a jury trial and all other rights and privileges accorded to a defendant in a criminal action. Petitioners further claim that they are immune from punishment by virtue of that portion of subdivision 13 of section 1209 of the Code of Civil Procedure, reading as follows: ''But no speech or publication reflecting upon or concerning any court or any officer thereof shall be treated or punished as a contempt of such court unless made in the immediate presence of such court while in session and in such a manner as to actually interfere with its proceedings.''

These issues were all before us in the case of *Bridges* v. *Superior Court,* recently decided by us and reported in 14

Cal. (2d) 464 [94 Pac. (2d) 983], and the same contentions were made by the petitioner in that case as are now made by the present petitioners. A reference to that decision will show that we held that none of said contentions were meritorious, and that we sustained the procedure followed in that case which is precisely like that pursued in these proceedings, and furthermore we held that the provisions of subdivision 13 of section 1209 of the Code of Civil Procedure, relied upon by the petitioner Bridges as well as by the petitioners in these proceedings were unconstitutional, and therefore afforded no protection for the publication of the article by the petitioner in that proceeding. It is apparent, therefore, that all the legal questions presented by these two petitions, and stated above, have been decided by us adversely to the contentions of said petitioners. No useful purpose would be gained by reiterating what we said in this former opinion in the decision of these questions. It, therefore, only remains for us to apply the law as settled by our previous decision to the facts in the present proceedings.

The first of these two proceedings was brought to review the order of the trial court adjudging the petitioner, The Times-Mirror Company, publisher of the Los Angeles Times, and L. D. Hotchkiss, managing editor of the Los Angeles Times, guilty of contempt of court upon the charge set forth in count 1 of the affidavit of J. Louis Elkins, and to review said order of said court adjudging the petitioner, the Times-Mirror Company, guilty of contempt of court upon two additional charges of contempt contained in said affidavit, and set forth in counts 3 and 5 respectively of said affidavit.

The second of said two proceedings was instituted to review the order of the trial court adjudging the petitioner, The Mirror Company, the publisher of the Los Angeles Times, the president of The Times-Mirror Company, and its managing editor, guilty of contempt of court upon the two charges contained in said second affidavit of J. Louis Elkins, presented to said superior court.

In determining whether the publication of an editorial, or article, commenting upon a pending action, renders the author thereof guilty of contempt of court, the test to be applied to such a publication is whether it had a reasonable tendency to interfere with the orderly administration of jus-

tice in the action which was the subject of the comment and which was then before the court for its consideration, or decision. If the article had that effect, then its publication rendered the person responsible for its publication guilty of contempt of court. This question was before us in the Bridges case, where authorities supporting the statements just expressed, from this court, the Supreme Court of the United States, and other jurisdictions, are cited and may be found on page 357 of our opinion.

The first of the several editorials to which we will give consideration is that set forth in count 1 of the accusatory affidavit presented to the court and sworn to by J. Louis Elkins. It is entitled, "Sit-Strikers Convicted", and referred to the case of *People* v. *William Busick et al.*, in which action the jury had rendered a verdict finding certain of the defendants guilty of a conspiracy to violate certain sections of the Penal Code. It was as follows:

"The verdict of a jury finding guilty the twenty-two sit-strikers who led the assault on the Douglas plant last February, will have reverberations up and down the Pacific Coast and in points farther east.

"The verdict means that Los Angeles is still Los Angeles, that the city is aroused to the danger of davebeckism, and that no kind of union terrorism will be permitted here.

"The verdict may have a good deal to do with sending Dave Beck back to Seattle. For, while the United Automobile Workers have no connection with Beck, their tactics and his are identical in motive; and if Beck can be convinced that this kind of warfare is not permitted in this area he will necessarily abandon his dreams of conquest.

"Already the united farmers and ranchers have given Beck a severe setback. The Hynes hay market is still free and it has been made plain that interference with milk deliveries to Los Angeles will not be tolerated.

"Dist-Atty. Fitts pledged his best efforts to prevent and punish union terrorism and racketeering in a strong radio address, and followed it up yesterday with a statement congratulating the jury that convicted the sit-downers and the community on one of the 'most far-reaching verdicts in the history of this country.

"In this he is correct. It is an important verdict. For the first time since the present cycle of labor disturbances

began, union lawlessness has been treated as exactly what it is, an offense against the public peace punishable like any other crime.

"The seizure of property by a militant minority which arrogated to itself the right of dictating not only to employers, but to other workers not in sympathy with it, what should be the terms and conditions of working, has proved to be within the control of local peace officers and authorities.

"Nobody ran off to Washington to get this affair handled. It was attended to right here.

"Government may have broken down in other localities; whole States may have yielded to anarchy. But Los Angeles county stands firm; it has officers who can do their duty and courts and juries which can function.

"So long as that is the case, davebeckism cannot and will not get control here; nor johnlewisism either."

■ The verdict finding said defendants guilty was rendered on December 20, 1937, and the trial judge before whom the case was pending, fixed December 22, 1937, as the time for pronouncing judgment upon the defendants. On the 21st of December, 1937, the above-mentioned editorial was published, which date, it will be seen, was one day after the verdict and one day before the time fixed by the court for pronouncing judgment. At the time fixed by the court, provided no motion for a new trial nor application for probation was made, it was the duty of the trial court to pronounce judgment against said defendants. By its verdict, the jury found the defendants guilty of a conspiracy to violate sections 418 and 594 of the Penal Code. While each of the crimes denounced in these sections respectively is made a misdemeanor, by section 182 of the Penal Code a conspiracy to commit a misdemeanor is punishable by imprisonment in the county jail or state penitentiary not exceeding two years, or by a fine not exceeding five thousand dollars, or both. By section 19a of the Penal Code, it is provided that in no case shall any person sentenced to confinement in a county jail on conviction of a misdemeanor be committed for a period in excess of one year. Therefore in sentencing the defendants found guilty by the jury in the case of *People* v. *William Busick et al.*, it was within the power of the trial court to sentence them to the county jail for one year or less, or to the state penitentiary, where under

the indeterminate sentence law they might be imprisoned for a term of two years, or they might be punished by a fine not exceeding five thousand dollars, or by both imprisonment and fine. The defendants in said action had the right to move for a new trial and also to make application for probation.

At the time of the publication of said editorial, it cannot be said that the proceedings in the case of *People* v. *William Busick et al.*, had reached such a point of finality as to form a proper subject of comment. The defendants found guilty by the verdict of the jury were yet to be sentenced by the court. They had the right in said action, at the proper time in the future, to make a motion for a new trial and an application for probation. Even if they did not make either said motion or application, the case against them was still pending for the purpose of pronouncing judgment. As we have shown, wide discretion was given the court in pronouncing judgment upon the verdict rendered by the jury. The judgment of the court, acting within the discretion with which the judge was by law clothed, might vary from a sentence to the state penitentiary for a possible term of two years, in which case the defendants would be guilty of a felony, or it might be a sentence of confinement in the county jail for a period as short as one day, or to pay a simple fine as low as one dollar. It is obvious that the pronouncing of judgment in a case of this character where such wide discretion is given the trial judge, was a matter of grave concern to the parties to the action, and particularly to the defendants, and it was of the utmost importance to them that the trial judge in pronouncing judgment against them should act strictly in accordance with the record before him, and that his judgment should not be hampered nor swayed by any outside influence. These observations apply also to the motion for a new trial and the application for probation. While neither motion nor application had been made at the time of the publication of the editorial, the right of the defendants to pursue said remedies existed at said time and the case in which they might be exercised was pending at the same time.

Furthermore, a motion for a new trial and an application for probation in the event a new trial is denied is in accordance with the ordinary and usual practice followed in criminal cases and is sanctioned by the Penal Code.

We can see no force in petitioners' argument that because the editorial was published after the verdict, but prior to the making of said motion or application, the proceedings in the case had reached such a point of finality as to form a proper subject of comment. ██ It cannot be successfully contended that the verdict was decisive of the case or was a final determination of the fate of the defendants. Even if we disregard the convicted defendants' right to move for a new trial and their right to apply for probation, there still remained, when said editorial was published, the duty of the court to pronounce judgment against said defendants. The case was still pending for that purpose, and until judgment was pronounced, any public comment which would have a reasonable tendency to influence the court in pronouncing sentence upon the defendants in said action would not be justified.

██ In respect to the judgment of the trial court finding both Hotchkiss, the managing editor, as well as The Times-Mirror Company, guilty of contempt of court for the publication of the editorial contained in count 1 and entitled "Sit-Strikers Convicted", it is contended that the accusatory affidavit fails to allege that L. D. Hotchkiss personally caused or permitted the publication of the editorial set forth in count 1, and the case of *Otis* v. *Superior Court,* 148 Cal. 129 [82 Pac. 853], is cited in support of said contention. The allegations in the two affidavits are materially different. In the Otis case, the affidavit alleged that certain individuals were officers of the publishing company, but contained no allegation that they caused or permitted the publication of the offending articles. The affidavit accusing petitioners of being in contempt of court in the present proceeding expressly alleges not only that petitioner, L. D. Hotchkiss, was the managing editor of the Los Angeles Times but that he, together with the publisher and other officers, "caused to be printed and published the issue of the Los Angeles Times which contained the editorial entitled 'Sit-Strikers Convicted'". It would be difficult to couch the affidavit in more direct terms.

██ We now pass to the consideration of the questions as to whether this editorial entitled, "Sit-Strikers Convicted", was of such a character as to render those responsible for its publication guilty of contempt of court. In our investigation of the various decisions of the several courts of this

country, including those rendered by the Supreme Court of the United States, respecting the character of publications which rendered their authors subject to disciplinary action by the courts in contempt proceedings, we are impressed with the statement found in an opinion rendered by Justice Holmes in the case of *Patterson* v. *Colorado*, 205 U. S. 454 [27 Sup. Ct. 556, 51 L. Ed. 879, 10 Ann. Cas. 689]. After referring to the effect of the publication of matters pending in a jury case upon the members of a jury before whom the action is being tried, that learned justice further stated, "What is true with reference to a jury is true also with reference to a court. Cases like the present are more likely to arise, no doubt, when there is a jury and the publication may affect their judgment. Judges generally, perhaps, are less apprehensive that publications impugning their own reasoning or motives will interfere with their administration of the law. But if a court regards, as it may, a publication concerning a matter of law pending before it, as tending toward such an interference, it may punish it as in the instance put. When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied."

This excerpt from the opinion of Justice Holmes was quoted with approval by this court in the two cases of *In re Shuler*, 210 Cal. 377, 403 [292 Pac. 481], and in the Bridges case. It may well be considered as a correct statement of the law in this state as the true test to be applied. This question was discussed in greater detail in the Bridges case where additional authorities are cited in support of the "reasonable tendency" rule.

In passing, we might here answer briefly the argument of petitioners that the proper test is not the reasonable tendency of the publication to interfere with the administration of justice or obstruct or embarrass the court in the decision of the pending matters, but is the effect of the publication upon the particular judge before whom the case is pending, or in the words of petitioner, "there must of necessity be a uniform yardstick to measure off or determine the presence or absence of 'reasonable tendency to influence'. This criterion or yardstick, we believe, and accordingly contend, is the mentality, fortitude and integrity of the average judge",

Petitioners cite no authority in support of their theory, and it has been expressly repudiated by a recent decision of the Supreme Court of the United States (*Sinclair* v. *United States*, 279 U. S. 749, 764 [49 Sup. Ct. 471, 73 L. Ed. 938, 63 A. L. R. 1258]), where that court held as follows: "In other words, having regard to the powers conferred, to the protection of society, to the honest and fair administration of justice and to the evil to come from its obstruction, the wrong depends upon the tendency of the acts to accomplish this result without reference to the consideration of how far they may have been without influence in a particular case. The wrongdoer may not be heard to try the power of the court to resist acts of obstruction and wrongdoing by him committed as a prelude to trial and punishment for his wrongful acts."

The editorial entitled, "Sit-Strikers Convicted" unquestionably approved the jury's verdict. It praises the jury for its rendition, and the court in which the action was pending. It discussed the importance of the verdict and its effect upon the industrial strife then being waged in and beyond the limits of the city of Los Angeles. Its reference to "union terrorism and racketeering" can only be construed as implying that the convicted defendants in the pending action were engaged in such activities. These expressions of approval of the verdict and condemnation of the convicted defendants made by such an influential paper as the Los Angeles Times on the day just preceding the day fixed by the court for pronouncing sentence could not help having an effect upon the trial judge, who, as we have seen, was clothed with a wide discretion in fixing the punishment of the convicted defendants, to say nothing respecting his duties in case a motion for a new trial was made or an application for probation was presented to him. It cannot reasonably be said that they would have no tendency to influence the trial judge in rendering the judgment, or in ruling upon the other matters that in the regular order of the proceedings in criminal matters would come before him in the case then pending. The editorial may not have been intended, but it is capable of being construed, as a notice to the trial judge that no leniency should be extended to the convicted men, and, furthermore, that should the court act contrary to the suggestions contained in the editorial, it might well expect adverse criticism in the columns of The

Times. Viewing the editorial in the light of these considerations, we are satisfied that its reasonable tendency was to interfere with the ordinary administration of justice by the court in the action then pending before it.

The next publication, being the editorial set forth in count 3 of said affidavit, was an editorial entitled, "The Fall of an Ex-Queen". It referred to Helen M. Werner, who on the 12th day of April, 1938, had been convicted by a jury on two counts, one charging her with an attempt to commit grand theft, and the other with a violation of section 653f of the Penal Code, respectively. On the same day, she gave notice of motion for a new trial, and the judge before whom the case was pending on the same day fixed April 22, 1938, as the time for hearing said motion and pronouncing judgment. On the 14th day of April, 1938, the alleged contumacious editorial was published. Practically the same discretion as was given the trial judge in pronouncing judgment in the case against the so-called "Sit-Strikers" was given him in the case against Helen M. Werner. The facts of the case are in principle similar, except that in the Werner case the defendant had actually made a motion for a new trial and said motion was pending at the time of the publication of the editorial in question.

The editorial was as follows: "Politics as we know it is an essentially selfish business, conducted in the main for personal profit of one kind or another. When it is of the boss type, it is apt to be pretty sordid as well. Success in boss-ship, which is a denial of public rights, necessarily implies a kind of moral obliquity if not an actually illegal one.

"So that it is something of a contradiction of sense if not of terms to express regret that the political talents of Mrs. Helen Werner were not directed to other objectives than those which, in the twilight of her active life, have brought her and her husband to disgrace. If they had been, she would not have been in politics at all and probably would never have been heard of in a public way. Her natural flair was purely political; she would have been miscast in any other sphere of activity.

"Mrs. Werner's primary mistake seems to have been in failing to recognize that her political day was past. For years she enjoyed the unique distinction of being the country's only woman boss—and did she enjoy it! In her heyday she had a finger in every political pie and many were

the plums she was able to extract therefrom for those who played ball with her. From small beginnings she utilized every opportunity to extend her influence and to put office-holders and promising political material under obligations to her. She became a power in the backstage councils of city and county affairs and from that place of strategic advantage reached out to pull the strings on State and legislative offices as well.

"Those were the days when Mrs. Werner was 'Queen Helen' and it is only fair to say that to her the power was much more important than the perquisites. When the inevitable turning of the political wheel brought new figures to the front and new bosses to the back, she found her grip slipping and it was hard to take. The several cases which in recent years have brought her before the courts to defend her activities seem all examples of an energetic effort to regain and reassert her onetime influence in high places. That it should ultimately have landed her behind the bars as a convicted bribe-seeker is not illogical. But if there is logic in it, the money meant less to Mrs. Werner than the name of still being a political power, one who could do things with public officials that others could not do. To herself at least she was still Queen Helen."

While the editorial does not refer to the case which was then pending against Helen M. Werner, it is hardly conceivable that those in charge of its publication were ignorant of the pendency of said action. Both Helen M. Werner and her husband had been active and prominent in politics both in the city and in the county of Los Angeles. In fact the editorial so states in so far as the activities of Helen M. Werner were concerned, and further suggests that she "reached out to pull the strings on state and legislative offices as well". With a person of such local prominence, charged with serious offenses, on trial, it must be assumed that the petitioners were cognizant of the action then pending against her, and that it had reached the stage which would require either the pronouncement of judgment, or the granting of a new trial. With this knowledge before them, they prepared and published the editorial which it must be conceded was a scathing denunciation of Mrs. Werner and a caustic criticism of her political activities in recent years. That a publication of this character concerning a person convicted by the verdict of a jury, and who was soon to appear

for sentence, would have a disturbing effect upon the judge before whom the case was pending when the time came for pronouncing judgment, we think can neither be questioned nor denied. Such a publication according to the authorities hereinbefore cited comes within those prohibited acts, the commission of which renders those responsible therefor liable to the punitive powers of the court.

The editorial contained in count 5 of said accusatory affidavit is entitled, "Probation for Gorillas?" It was published after two defendants, Shannon and Holmes, had been found guilty by a jury of conspiracy to violate section 245 of the Penal Code [assault with a deadly weapon] and assault with a deadly weapon. They made application for probation, and on the 2d day of May, 1938, the judge who presided at the trial set June 7, 1938, as the time for passing upon their application for probation. On May 5, 1938, the editorial entitled as above was published, and is as follows:

"Two members of Dave Beck's wrecking crew, entertainment committee, goon squad or gorillas, having been convicted in Superior Court of assaulting nonunion truck drivers, have asked for probation. Presumably they will say they are 'first offenders', or plead that they were merely indulging a playful exuberance when, with slingshots, they fired steel missiles at men whose only offense was wishing to work for a living without paying tribute to the erstwhile boss of Seattle.

"Sluggers for pay, like murderers for profit, are in a slightly different category from ordinary criminals. Men who commit mayhem for wages are not merely violators of the peace and dignity of the State; they are also conspirators against it. The man who burgles because his children are hungry may have some claim on public sympathy. He whose crime is one of impulse may be entitled to lenity. But he who hires out his muscles for the creation of disorder and in aid of a racket is a deliberate foe of organized society and should be penalized accordingly.

"It will teach no lesson to other thugs to put these men on good behavior for a limited time. Their 'duty' would simply be taken over by others like them. If Beck's thugs, however, are made to realize that they face San Quentin when they are caught, it will tend to make their disreputable occupation unpopular. Judge A. A. Scott will make a serious

mistake if he grants probation to Matthew Shannon and Kennan Holmes. This community needs the example of their assignment to the jute mill.''

But little is said, or can be said, in defense of the publication of this editorial. Among other things, it calls by name the judge before whom the action was pending, and directly charges that the judge will make a serious mistake if he grants probation to the two convicted defendants. The editorial as a whole is a striking example of a ''premature statement, argument, and intimidation'' respecting the case on trial which the court condemned and held to be contumacious in the case of *Patterson* v. *Colorado, supra.*

While petitioner, The Times-Mirror Company, advances no serious defense of its publication of said editorial in so far as the character and nature of the editorial are involved, it does insist that as the matter then before the court was the question of probation the petitioner was privileged to make whatever comment it was thought advisable under all the circumstances of the case. In other words, petitioner contends that a different rule applies to statements made and articles published respecting a case, or the parties thereto, when the sole matter before the court relates to the probation of a defendant than when the court has under consideration the guilt of the defendant or other strictly legal question arising during the trial of a defendant in a criminal action. When the sole matter before the court relates to the probation of a defendant petitioner contends that any person is free to communicate with the court or to express his opinion publicly through the press, or otherwise, respecting the propriety or advisability of the court's granting or denying probation to the applicant. We find ourselves unable to agree with this contention. Section 1203 of the Penal Code prescribes the procedure governing applications for probation and the source from which the court may receive the necessary information to enable it to act in such matters. By this section of the code the court must refer the application to the probation officer whose duty it is after investigation to make a report to the court which report the court must consider in making its final decision in granting or denying probation. We find nothing in said section of the code nor in any other provision of the law which would justify any different approach to the court when matters of probation are before it than when the regu-

lar proceedings before and at the trial are under the court's consideration. Mr. Chandler in an affidavit filed with the trial court at the hearing of the contempt proceedings against petitioners stated, "In one recent probation case, The Times was advised by a former presiding superior judge that a criticism of probation published subsequent to the granting should have been made known while the matter was pending instead of afterwards". If this advice could be construed as permitting the publication of an editorial like that entitled, "Probation for Gorillas?" then the same right should be accorded to those newspapers favoring the probation of these same defendants referred to in the editorial. We would then have the deplorable situation of a heated newspaper controversy being carried on in the community while the question of probation was before the court for determination. That such a situation would contribute to the orderly administration of justice, we think no one would contend. We do not mean to hold that a person interested for or against the probation of a defendant may not make known his views as to the propriety of granting or denying probation to the probation officer, so that this officer may investigate the source or grounds of these views and report the result of his investigation to the trial judge. But to approach the judge either directly or indirectly, through the columns of a newspaper, or otherwise, in our opinion is not permissible. The probation of a defendant is a legal act of the court and is governed by the same rules as are applicable to any other legal proceeding before the court.

Possibly by reason of the title of the editorial, and the calling of the trial judge by name, followed by the statement that he would make a mistake if he should grant probation to the defendants, petitioner has considered this editorial as referring only to the application of defendants for probation. But the application for probation was not the only matter in that action that was then pending before the court. Judgment had not yet been pronounced in said action. The same wide discretion was given to the trial judge in sentencing the defendants in the criminal action commented on in this editorial as was given the trial judge in the actions commented on respectively in the two previous editorials. Therefore, what we have said respecting the effect of each of the two preceding editorials, is applicable to the publication of the editorial entitled, "Probation for

Gorillas?'' It referred to an action which was then pending in court, and the statements contained therein were calculated to and had a reasonable tendency to influence the proceedings in said action, and to interfere with the proper administration of justice by the court in which said action was pending.

In Mr. Chandler's affidavit he sets forth at some length the history of the industrial strife that has been waged in Los Angeles and in other parts of the United States during the past years. In this affidavit, he states, ''For approximately fifty years, the Los Angeles Times has been the principal newspaper exponent in the United States of the open shop system of industrial relations''. It is further shown in said affidavit that the position of the Los Angeles Times respecting the industrial controversy was well known in the city of Los Angeles and elsewhere throughout the state. The affidavit then goes into some considerable detail as to the part taken by the Los Angeles Times in condemning the ''sit-down strikes'', and the strike of the teamsters' union to which the two convicted defendants mentioned in the ''Probation for Gorillas?'' editorial belonged. It was stipulated that the allegations contained in said affidavit were true.

From the facts set forth in said affidavit it is contended that the position of the Los Angeles Times was so well known in the city of Los Angeles both by the citizens generally and the officials of said city and the county of Los Angeles, including the members of the judiciary of said county, that the superior judges before whom the two actions were pending would not be influenced nor would either of the defendants in either of said actions be prejudiced to any extent by the publication of the respective editorials which particularly referred to the action in which they were convicted. The weight to be given to this evidence was solely a matter resting with the trial court. In these proceedings for the review of the judgments of the trial court finding the petitioners guilty of contempt, the sole question before us is one of jurisdiction of the trial court to render the judgment under review, and in such a case the review of the evidence is limited to determining whether there was any substantial evidence to sustain the jurisdiction of the trial court. (*McFarland* v. *Superior Court,* 194 Cal. 407 [228

Pac. 1033]; *Bridges* v. *Superior Court*, 14 Cal. (2d) 464 [94 Pac. (2d) 983], and authorities therein cited.) The affidavit of Mr. Chandler did no more than cause a conflict in the evidence which the trial court resolved against petitioner.

█ It is earnestly and seriously contended by petitioners that the order adjudging petitioner guilty of contempt of court violates the right of freedom of speech and of the press guaranteed by the state and federal Constitutions. What we said in the Bridges case respecting the right of free speech applies with equal force to the claim of petitioners herein that they are protected in the publication of said editorial by the constitutional guaranty of freedom of the press. There is no fundamental difference between these two constitutional privileges. The right of free speech and the freedom of the press are guaranteed by the same section of both the federal and state Constitutions. In *In re Shuler*, 210 Cal. 377, 402 [292 Pac. 481], we held that, "No difference can be discerned between the rights of the citizen and the proper limitation thereof under his aforesaid constitutional guaranty, whether that citizen be a minister speaking from his pulpit, or a broadcaster through the radio, or an editor through his newspaper, or a curbstone orator . . . or an anarchist . . . the right and the limitation thereof being the same when the matter involved in the utterances of all or any of these affects or manifestly tends to affect the orderly administration of justice in pending causes before judicial tribunals and the judges thereof." And in *In re Shortridge*, 99 Cal. 526, 535 [34 Pac. 227, 37 Am. St. Rep. 78, 21 L. R. A. 755], we find this concise language, "As stated before, what may be spoken may be written, and the converse of the proposition is true that what may not be spoken under such circumstances may not be written."

The constitutional right of freedom of the press and the limitations thereon have been the subject of innumerable decisions of the state and federal courts. We shall cite only a very few of these decisions, and briefly quote from them.

In the case of *Toledo Newspaper Co.* v. *United States*, 247 U. S. 402 [38 Sup. Ct. 560, 62 L. Ed. 1186], there existed a bitter controversy between the city of Toledo and a street railway operated in said city. This controversy led to an action between these parties in which the creditors of the railway company intervened. While this action was pending, a local newspaper, published by the Toledo News-

paper Company, began the publication of articles adverse to the rights asserted against the city by the creditors and the railway company. The publisher and editor of the newspaper were found guilty of contempt of court by reason of the publication of said articles. The matter came before the Supreme Court of the United States and among other contentions was the contention that the publications related to a matter of public concern and were safeguarded from being made the basis of contempt proceedings by ''the assuredly secured freedom of the press''. In answering this contention the court on page 419 of the opinion said: ''We might well pass the proposition by because to state it is to answer it, since it involves in its very statement the contention that the freedom of the press is the freedom to do wrong with impunity and implies the right to frustrate and defeat the discharge of those governmental duties upon the performance of which the freedom of all, including that of the press, depends. The safeguarding and fructification of free and constitutional institutions is the very basis and mainstay upon which the freedom of the press rests, and that freedom, therefore, does not and cannot be held to include the right virtually to destroy such institutions. It suffices to say that, however complete is the right of the press to state public things and discuss them, that right, as every other right enjoyed in human society, is subject to the restraints which separate right from wrongdoing.''

In *State* v. *Lovell*, 117 Neb. 710, 717 [222 N. W. 625], the Supreme Court of that state has expressed similar views in the following language: ''The freedom of the press vouchsafed by the Constitution implies the publisher's respect for the equal rights of others. One of those rights that the publisher is bound to respect is a litigant's privilege of appearing before an independent, impartial court for judicial redress, uninfluenced or embarrassed by contemptuous publications pending litigation. Under the Constitution this right is as sacred as the freedom of the press. By both state and federal Constitutions government is composed of distinct legislative, executive and judicial departments of equal rank. The judiciary is an independent tribunal to which the individual may resort whenever his property rights are invaded by private wrongdoers, by public agencies or by the legislative of executive departments. In controversies over rights

guaranteed by the Constitution the individual stands before the court on an equality with government itself. The constitutional provision creating an independent judiciary is recognized by historians, philosophers and statesmen as a vast contribution to the science of government. To preserve the purity, impartiality and independence of the court is a solemn duty that cannot be evaded without endangering all constitutional rights, including the freedom of the press.'' The same court in the case of *State* v. *Bee Pub. Co.*, 60 Neb. 282, 296 [83 N. W. 204, 83 Am. St. Rep. 531, 50 L. R. A. 195], expressed itself as follows: ''Courts are charged with the function of administering justice, and it is their duty not only to give to every suitor his demandable right, but to give him assurance that no banned and hostile influence shall operate against him while his cause is under consideration. A litigant is entitled not only to a just decision, but to a decision altogether free from the suspicion of having been coerced. Nothing else will satisfy him; nothing less can fill the measure of his expectations. He has no standard with which to gauge judicial firmness; and if the court has been exposed to influences calculated, as in the Kennedy case, (*State* v. *Kennedy*, 60 Neb. 300, [83 N. W. 87]), to tell against him, he will not know whether an adverse decision is the voice of the law or an echo of the mob.''

In *Tate* v. *State*, 132 Tenn. 131 [177 S. W. 69], the Supreme Court of Tennessee, at page 139 of its decision states the rule in the following terms: ''The liberty of the press is not a more sacred right than the right to a fair and impartial trial, which the Constitution guarantees to all litigants. If the newspapers are permitted at will to comment on pending cases and to bring to the attention of the jurors sensational rumors and matters which cannot properly be considered in the determination of the issues before them, there can be no such trial. That such publications can be made with impunity is not asserted in any jurisdiction, so far as we know. The courts must be empowered to keep jurors from improper influence pending their deliberations.''

The United States Circuit Court of Appeals of the Ninth Circuit in *In re Independent Pub. Co.*, 240 Fed. 849, 862, states the law as follows: ''Liberty of the press is subordinate to the independence of the judiciary, and it is not expedient that any class in the community should be privileged to

interfere with the rights of litigants or to embarrass or obstruct the administration of justice.''

It is useless to further extend the citation of authorities upon this subject. The above are sufficient to show, we think, conclusively that the constitutional right of freedom of the press does not protect petitioners in the publication of the editorials contained in counts 1, 3 and 5 respectively of the affidavit filed in the first of the two proceedings now before us. On the other hand, the law as expressed by the overwhelming weight of authority establishes that petitioners were not justified in the publications of said editorials concerning pending actions and that the order adjudging petitioners guilty of contempt of court as set forth therein should be affirmed.

Our attention has been called to the very recent cases of *Schneider* v. *State of New Jersey*, and others, decided, November 22, 1939, and reported in 308 U. S. 147 [60 Sup. Ct. 146, 84 L. Ed. 155]. These cases all involve ordinances of certain cities prohibiting the distribution of handbills within the municipality. It was held that these various ordinances were an infringement upon the constitutional guaranty of freedom of speech and the press. We are unable to discern any applicability of these cases to the case now before us. The principal claim in support of the constitutionality of these ordinances was that the circulation of handbills tendered to litter up the streets of the city and render them unsightly and offensive, and the purpose of the ordinances was to keep the streets clean from the litter and refuse resulting from the indiscriminate distribution of the handbills. The court held that there were other methods of preventing such littering of the streets, among which the court suggested was the punishment of those who actually throw papers on the street. Furthermore, the court held that the additional burden imposed upon the city authorities in cleaning and caring for the streets as an indirect consequence of such distribution was insufficient to justify the enactment of an ordinance which would infringe upon the constitutional guaranty of freedom of speech. In those cases the only detriment which might result from the distribution of handbills was the possible additional cost to the city in the cleaning of its streets. In the present case the detriment caused by the publication of said editorials was the probable denial of a fair trial to the litigants in the

actions then pending before the courts which were the subject of said editorials. It appears to us that the inapplicability of those cases to the instant case is obvious.

The two editorials which formed the basis of the contempt proceedings and the subsequent conviction of certain of the petitioners as set forth in the record of the second of the two proceedings now before us were published on June 5th and 7th respectively in the Los Angeles Times, following the institution of the first of these two proceedings on June 3, 1938. The accusatory affidavit in the first of said proceedings was filed in the Superior Court of the County of Los Angeles on the 3d day of June, 1938, and on the same day said court issued an order requiring the respondents in said proceedings to appear on the 23d day of June, 1938, to show cause why they should not be adjudged guilty of contempt of court. The editorials in question were therefore published while the first of these two proceedings was pending in said court. The editorials are lengthy and for that reason are not set forth herein. The first of the two editorials was mainly devoted to a *résumé* of the five cases commented upon in the previously published editorials. These five cases at that time had reached a point of finality and were therefore subject to proper comment by any citizens. The second of the editorials consisted largely of a defense of the right of free speech and the freedom of the press. Each editorial referred to the pending contempt proceeding against petitioners and criticized the committee of the bar association for instituting said proceedings. The trial court in referring to the cases of *In re Lindsley*, 75 Cal. App. 122 [241 Pac. 934], characterized the editorials involved in that case as ''vitriolic and vituperative'' and added ''while here they cannot be so classed''. The editorials were temperate and considerate and were free of any abusive or immoderate language. In fact, the trial court stated that the editorials constituted ''an argument that might have been used upon the trial''. In view of the authorities hereinbefore cited respecting the character of the publications which subject their authors to punishment for contempt of court, we are unable to hold that either of the two editorials published on June 5th and June 7th respectively, came within that class.

It is therefore ordered that the judgment of the trial court in case L. A. No. 16928 be and the same is hereby affirmed,

and that the judgment in case L. A. No. 16929 be and the same is hereby reversed.

Shenk, J., Carter, J., Waste, C. J., and Pullen, P., *pro tem.*, concurred.

EDMONDS, J., Dissenting.—In the case of *Bridges* v. *The Superior Court*, 14 Cal. (2d) 464 [94 Pac. (2d) 983], I stated at length the reasons for my opinion that section 1209 of the Code of Civil Procedure is constitutional and should be upheld. This statute which was adopted almost fifty years ago and within a few months after a newspaper editor had been found guilty of contempt of court, declares the public policy of the people of this state in regard to publications relating to a judge which are not made in the immediate presence of a court while in session and in such manner as to actually interfere with judicial proceedings.

Whether persons should be allowed to write or speak about a court or judge under the conditions mentioned in the statute without being subject to prosecution for contempt of court in summary proceedings, is a question upon which there will always be great difference of opinion. But it is not the province of a court to determine the policy which is most conducive to human welfare and governmental stability. That is the legislative function, and the judicial department may only consider whether the determination of the legislature violates a constitutional guarantee.

In my judgment, the opinions of this court in former cases where the statute was in question were written with more concern for upholding the inherent power of courts than for the constitutional guarantees of free speech and a free press. Yet the experience of New York and Pennsylvania, where laws similar to that of California have been in effect for over one hundred years, show that neither the existence of nor respect for courts has been seriously challenged by taking from judicial officers the uncontrolled right to pass upon alleged constructive contempts of court. Judicial necessity based upon the claim of inherent power is neither reason nor authority for setting aside a statute which expresses the policy of the people of this state concerning acts which might otherwise be punishable as constructive contempts.

For these reasons I believe that each of the judgments should be reversed.

GIBSON, J., Dissenting.—I dissent. The law as laid down in the Bridges case is controlling in this jurisdiction on the power of a court to punish summarily for constructive contempt. But, as I did not participate in the Bridges case, and the question is before me for the first time, it seems appropriate to express my views thereon. I disagree with the conclusion reached in the Bridges case and in the majority opinion herein, and I concur in the views of Justice Edmonds, dissenting in each case.

The rules laid down in these cases do not give adequate recognition to or protection for the constitutional right of free speech and press, but instead sacrifice that fundamental right for a need which is fancied rather than real. The integrity and independence of the court is not the only matter to be considered. There is the equally important and equally fundamental need of fearless comment on all activities affecting the public welfare, including the operations of the courts. To preserve one basic right at the expense of another is a doubtful gain. And, as very clearly appears from this and other proceedings, the two rights frequently come into conflict. When this happens, each must give way in some degree in order that a proper balance may be maintained, and both preserved. A court is usually most concerned with the immediate problem of safeguarding itself from outside influences during a pending proceeding; but in invoking drastic measures toward that end, it may do irreparable damage to the other fundamental right.

The assumption that to permit legislative regulation of the asserted inherent power of a court to punish summarily for constructive contempt would ultimately lead to its destruction, is without foundation.

There is doubtless some justification for this fear where direct contempts, those which actually interrupt the court proceedings, are involved; but constructive contempts do not demand the same prompt and summary action. Their effect is indirect and not immediately felt; their punishment can likewise be delayed without injury to the court's prestige or procedure. If the courts should actually be subjected to intimidation or other improper influences by persons immune from any punishment or restraint under the statute law, then the court could doubtless assert its power as an arm of the government in its own behalf. But no such situation has

arisen either here or elsewhere, and I doubt whether it ever could arise in normal times. However desirable it might seem from the viewpoint of the court to have this power, it is not in fact necessary to enable it to function and it is both safe and consistent with democratic principles to leave the matter within the control of the legislature.

The experience of those few states which have acquiesced in the legislative regulation of the court's power to punish for constructive contempt is ample proof of the fact that the courts function just as well and safely under such regulation as they do where they are entirely free from it. We have seen no signs and have heard no charges of disrespect or impaired efficiency with regard to the courts of Pennsylvania, Kentucky, New York or South Carolina, where the inherent power doctrine is not followed. In our own state an example of peculiar inconsistency is found in the rule on disqualification of judges. If, as the majority opinion holds, the inherent power of the courts makes them immune from legislative interference, no regulation which limits that power can be valid. But we have upheld legislation which permits the challenge of a judge for bias or other disqualification in proceedings for constructive contempt. (See, *Briggs* v. *Superior Court*, 211 Cal. 619 [297 Pac. 3].)

There is a growing belief among thoughtful students of this problem that the solution is to eliminate summary punishment and make the offense subject to the usual rules of criminal trial. The court's integrity may be protected in the same manner as other rights of person and property and other institutions of government are protected. This is indeed, as Justice Edmonds shows, the historically correct position; the venture into summary punishment has been demonstrated to be both bad history and bad law. Today the security of the state and all of its departments, officers, and branches, except the judiciary, is protected from improper influences only by the general statute law enforceable by trial of the offender in the courts before a jury. We would, I am sure, be amazed at the suggestion that any other officer or body of government, executive or legislative, be given this potent power; yet to the intelligent observer who is not a judge of a court, the spectacle of a judicial officer acting as prosecutor and judge, and meting out punishment besides, must seem equally amazing. The same observer might further reflect on the fact

that matters having a purely hypothetical tendency to interfere with a judicial proceeding are conceived to require a more drastic system of suppression and punishment than overt acts of treason or rebellion striking at the very foundation of the government. In time we shall, I believe be brought to the conclusion that the normal course of trial is adequate and proper, and that either by a change in judicial viewpoint or by a constitutional amendment the legislative control will be recognized. (See, comments, 48 Yale L. J. 54; 7 Geo. Wash. L. Rev. 234, 241.)

But this point is for the present settled by the Bridges case, and must be accepted as the basis of decision in the instant case. Conceding the power, therefore, a problem of equal importance and perhaps greater difficulty arises in defining its scope. The test adopted by the majority opinion is the tendency of the publication to influence the proceeding. Under this test the inquiry is not as to what happened, but as to what might have happened. It is the supposed tendency of the publication to affect and not its actual effect which is involved. It is not the trial judge himself, but an hypothetical judge with whom the test is concerned. Denial by the accused of any intention to influence is futile, since the tendency alone is considered. Denial by the judge that he was in fact influenced is likewise no defense, and indeed is not even relevant. It is not material to inquire whether the publication was seen or read by the judge or jury, since this would throw light only upon its actual effect.

This test is so vague and elastic, varying with the viewpoint of the individual judge who cites the offender, that it necessarily places an unreasonable restraint upon free speech and press. In the first place, the establishment of so loose a rule provides a temptation for the judge to invoke the power over contempt as a means of prohibiting political or personal attacks upon him or his views. We are all well aware of the constantly broadening scope of the judiciary as an interpreter of constitutional and statutory policies in the field of government, and there is grave danger in permitting a court to ward off criticisms directed at its policies, under the guise of protecting a particular court proceeding from improper influences. As Mr. Chief Justice Taft said, concurring in *Craig v. Hecht*, 263 U. S. 255, 279 [44 Sup. Ct. 103, 68 L. Ed. 293]: " . . . the delicacy there is in the judge's deciding whether

an attack upon his own judicial action is mere criticism or real obstruction, and the possibility that impulse may incline his view to personal vindication, are manifest''.

In the second place the test permits the placing of restraints on speech and press as varied as the sensitivities of a particular judge. The present case furnishes us an excellent example of the confusion thus engendered. The Los Angeles Bar Association Committee, the trial judge and this court do not agree on the character of certain of the publications. The necessary result of such differences of opinion is to cause critics and commentators to limit or entirely forego their public function rather than to risk the uncertainties of contempt charges by temperamental judges.

In sharp contrast is the view of a few courts and nearly all of the writers that the publication should not be considered contemptuous unless it actually interferes with the orderly administration of justice. Under this test no remote possibility or tendency toward obstruction is sufficient. Nor is the effect of the publication on a weak judge or a purely hypothetical judge the controlling factor. The judge is assumed to be possessed of a character commensurate with his position, and able to withstand the incidental effects of free public discussion of issues involved in a judicial proceeding. This attitude is well stated in Mr. Justice Holmes' dissenting opinion in *Toledo Newspaper Co.* v. *United States*, 247 U. S. 402 [38 Sup. Ct. 560, 62 L. Ed. 1186]. And in the leading case of *State* v. *American News Co.*, 64 S. D. 385 [266 N. W. 827, 833], the court said: ''We believe that any publication to be punishable as contempt, should be embarrassing or obstructive to the administration of justice in a pending case, and obstructive in fact rather than in theory or by possibility. . . . We think the courts should reserve the use of the weapon of contempt for such publications as can fairly and reasonably be said likely in point of actual fact to intimidate, influence, impede, embarrass, or obstruct the court in the due administration of justice in an actually pending matter. And we entertain the opinion that if error is made in either direction in determining that question, it is better and wiser to err in favor of absolute and unrestricted freedom of speech rather than in the other direction.''

It seems to me that if we are to accept the doctrine of summary punishment for constructive contempt, the extraordi-

nary power thus created and applied in defiance of the legislative will should be used sparingly and cautiously. We should not ignore the growing suspicion that courts are prone to place their own security above all other considerations. We should recognize the importance, indeed, the vital necessity of the fullest comment and criticism in matters of public interest, and not seek to exempt the courts from such criticism. The course of reform in the judicial field itself depends in part upon a free and vigorous press which should not hesitate to condemn where it finds the actions of the court subject to condemnation, and the editorial page cannot be confined to abstract academic discussion of non-controversial matters or of issues long dead. In short, we must look frankly at the realities; we must remember that many factors consciously or unconsciously influence judges, and that some are accepted as normal or unavoidable. We should apply the summary power, if at all, only to those publications which appear to ordinary persons intended and calculated to work an unmistakable and unjustifiable influence upon a particular case.

In reading over the editorials adjudged contemptuous in the present proceedings, it is difficult to perceive the manner in which they were found to constitute an improper interference with the administration of justice. Not one of them appeared until the verdict of the jury had been rendered after the conclusion of the trial. It was not proved that they were intended to exercise a prejudicial influence on the judge, nor that he saw or read them. The asserted contempt is derived entirely from the supposed tendency of the language used. We should expect, therefore, to find in them some formidable threat or intimidation, or at least some demands on the judge for specific action, coupled with suggestions or reprisal if the demands go unheeded. But these writings are not of this character.

The first editorial ''Sit-Strikers Convicted'' commends the conviction of certain persons as a victory for law and order and expresses pride in the functioning of local courts and juries. It refers to a radio address made by the district attorney and quotes a statement made by him congratulating the jury on one of the ''most far reaching verdicts in the history of this country''. There is certainly nothing in this editorial which should influence any judge in the performance of his duty.

The second editorial "The Fall of an Ex-Queen" is a brief and penetrating commentary on the political activities of Helen M. Werner. The subject of the editorial is used as an object lesson and the principal thought expressed therein is that political bosses rise and fall with changing times. I cannot find anything in this editorial which can be said to have even a remote tendency to obstruct the administration of justice or to influence or embarrass any judge.

The third editorial is entitled "Probation for Gorillas?" It is a denunciation of certain defendants found guilty of deadly assaults in connection with a labor dispute. It abounds with such scathing terms as "wrecking crew", "sluggers for pay" and "thugs"; it urges that an example be made of them, and adds: "Judge A. A. Scott will make a serious mistake if he grants probation" to these men. Now this is strong language, and the statement just quoted was ill advised and unfortunate, but it does not necessarily follow that it was contemptuous. The publisher's affiadvit calls attention to the familiar fact that in probation proceedings outside opinions and recommendations are invited. It is further pointed out that a former presiding judge of the superior court advised the Times that a criticism of a certain probation order published after it was granted, should have been made while the matter was pending. It appears that the Times has blundered in following the example of a district attorney, and in taking the suggestion of a superior court judge, with reference to the propriety of commenting on judicial proceedings.

Consider, however, the character of the case, and the circumstances surrounding it. This was no everyday affair, but one in which the public interest was aroused, and the events were widely discussed in the community. The views expressed by the Times were those held and freely expressed by many others. The attitude of the Times is made abundantly clear, and its bitter feeling toward certain labor leaders colors its opinions, but what of that? The Times is not on trial for its opinions; its readers will judge those for themselves. The Times is charged with obstructing justice and interfering with a pending judicial proceeding, and there is no evidence whatever of such obstruction or interference. The case had been tried, and verdict rendered; the jury was gone, and matters of sentence and probation were before the

judge alone. In deciding these matters the judge has few, if any definite rules to guide him; he is influenced by countless experiences and observations, as well as by the total sum of impressions received from public and private comment on similar problems throughout his judicial life. In this group of impressions the present editorial, if actually seen and read, could hardly be said to occupy such a dominant place as to be obstructive or embarrassing.

And what if the judge was, in fact, aware of the views expressed in the third editorial; can it be said he was being informed for the first time of the position of the Times in cases of this character? Could there be any possible doubt in the mind of any informed resident of Los Angeles on the attitude of the Times in regard to the use of violence in labor disputes? The position maintained by the Times over many years on these matters is clearly established by the record. Its Los Angeles readers would find nothing unusual in the editorial; a judge who felt that it was obstructive or embarrassing would have to confess ignorance of one of the most familiar facts of the daily life of his community.

If the power over contempt is to be fairly and reasonably applied, two essential limitations on the test of constructive contempt must be recognized. First, it should be applied only to those publications of an unusual and abnormal character, those which to a layman are obviously improper and dangerous, because vindictive, threatening or inciting to violence. It should be inapplicable to comments of the usual, normal and expected type which the ordinary intelligent layman constantly meets with in the public press, the radio and informal discussion. Second, it should be applied only where it clearly appears that the publication was intended to reach the particular judge and was seen and read by him; and then only where it was of such a nature as to influence improperly a judge of ordinary firmness. We should assume that judges specially chosen for their important positions are capable of maintaining an impartiality and independence where others might weaken; we should realize that a judge of ordinary firmness should be a person of exceptional independence and integrity, immune from all but extraordinary influences.

Finally, in determining whether there is a tendency to obstruct justice, we should give due consideration to the stage

of the case at which the publication occurs. When a period of relative finality is reached, as by the rendition of a jury's verdict, the dangers of outside influence have been reduced to a minimum, and comment thereafter should be freely permitted. At this stage, the newspapers must fulfil their proper function of criticism, and if they fail to comment when a matter is timely, they will be ignored when their belated observations are eventually made. To say that a case is pending until its final adjudication is to state a legal platitude in place of a practical doctrine. If the case is beyond the reach of discussion even after a jury's verdict, and until the final conclusion of proceedings for probation, new trial and appeal, there can never be anything of value in public discussion of such matters. In truth, both from the point of view of the law and practice, no such theory is followed. There are but few cases which hold that comment after a jury's verdict and before sentence or judgment on appeal is contemptuous. (See 48 Yale L. J. 54, 61.)

Viewed in retrospect, these contempt charges were a regrettable mistake. No evidence of actual interference with any legal proceeding was produced. Nothing in the editorials was intended or calculated to thwart the rendition of impartial justice in the matters then before the court. No judge seems to have felt the pressure of improper influences. No disturbance of judicial calm occurred until after the accusations were filed.

All this is indicative of the lengths to which imagination may go in building groundless fears and in imputing potent and obstructive purposes foreign to the intent of the writer. I think that by our decision in this and the Bridges case we have sacrificed a substantial part of our cherished freedom of speech and press in order to stamp out an evil that does not exist.

The judgments should be reversed.

Rehearing denied. Edmonds, J., and Gibson, J., voted for a rehearing.